# EXHIBIT A

1  Lionel Z. Glancy (SBN 134180)
   Robert V. Prongay (SBN 270796)
2  Jonathan M. Rotter (SBN 234137)
   **GLANCY PRONGAY & MURRAY LLP**
3  1925 Century Park East, Suite 2100
   Los Angeles, California 90067
4  Telephone: (310) 201-9150
   Facsimile: (310) 201-9160
5  Email: info@glancylaw.com
6
7  *Attorneys for Plaintiff and the Proposed Class*
   *[Additional counsel on signature page]*
8

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

AUG 22 2017

R. NATIVIDAD

AUG 22 2017

9
10        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
11               **FOR THE COUNTY OF RIVERSIDE**
12
   RENEE MACLAUGHLAN BOZARTH,           )   CASE NO. **RIC 1715683**
13 individually and on behalf of all others )
   similarly situated,                   )   CLASS ACTION COMPLAINT
14                                        )
                        Plaintiff,        )   1. VIOLATIONS OF CALIFORNIA
15                                        )      UNFAIR COMPETITION LAW;
16            vs.                         )   2. VIOLATIONS OF CALIFORNIA
                                          )      CONSUMERS LEGAL REMEDIES
17 ENVISION HEALTHCARE                    )      ACT;
   CORPORATION, EMCARE HOLDINGS,         )   3. BREACH OF IMPLIED CONTRACT OR
18 INC., EDS-I PRACTITIONERS OF          )      QUASI-CONTRACT;
   CALIFORNIA, ANTHEM INC.,              )   4. BREACH OF THE COVENANT OF
19 ANTHEM BLUE CROSS AND BLUE            )      GOOD FAITH AND FAIR DEALING.
   SHIELD, and BLUE CROSS OF             )
20 CALIFORNIA, d/b/a ANTHEM BLUE         )
   CROSS,                                )
21                                        )   **DEMAND FOR JURY TRIAL**
                        Defendants.       )
22                                        )
23                                        )
                                          )
24                                        )
                                          )
25
26
27
28

CLASS ACTION COMPLAINT

Plaintiff Renee MacLaughan Bozarth ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Envision HealthCare Corporation ("Envision"), EmCare Holdings, Inc. ("EmCare"), EDS-I Practitioners of California ("EPC"), Anthem Inc., Anthem Blue Cross and Blue Shield ("Anthem BCBS"), and Blue Cross of California d/b/a Anthem Blue Cross ("Anthem Blue Cross")[1] (collectively, "Defendants"), and alleges upon information and belief, except as to the allegations that pertain to Plaintiff and her counsel, which are based on personal knowledge, as follows:

## INTRODUCTION

1.      Plaintiff brings this putative class action on behalf of all persons residing in the State of California who were provided emergency medical services at an in-network emergency department ("ED") by an out-of-network provider employed/hired by EmCare or an affiliate, and received a surprise bill from the provider for an amount beyond the reasonable fair market value rates.

2.      Patients across the country are being ambushed by "surprise billing," which occurs when a patient goes to a hospital that her health insurance identifies as "in-network," only to find out later that the doctors are "out-of-network" and their services are not covered by her insurance. The out-of-network providers, unconstrained by any negotiated agreement, then bill the patient for amounts in excess of the reasonable fair market value of the services provided. The result can be financially disastrous for consumers who reasonably thought they had nothing to worry about since they had obtained health coverage and went to an in-network facility.

3.      Disturbingly, surprise billing is especially common in emergency rooms, where patients are least likely to be able to think clearly and generally do not get to choose which doctor will treat them.  The problem is compounded when an out-of-network physician's group contracts with an in-network hospital and not only sends surprise bills to patients, but also

---

[1] Unless otherwise specified, Anthem Inc., Anthem BCBS, and Anthem Blue Cross are collectively referred to herein as "Anthem."  The term "Anthem" also includes all of Anthem Inc.'s subsidiaries and "doing business as" (d/b/a) monikers.  Anthem is licensed to conduct insurance operations in all 50 states through its various subsidiaries, including Anthem Blue Cross.

1    charges a higher rate for the same medical services than fair market value.

2        4.    This is EmCare's *modus operandi*.  When EmCare contracts to provide physician

3    staffing for a hospital's emergency department, insured patients are treated by out-of-network

4    physicians, a fact they discover when they receive surprise bills for non-negotiated, unreasonable

5    charges not covered by their insurance.  Not only does the incidence of surprise billing increase

6    when EmCare enters the picture, but higher rates are charged for the same medical services and

7    more services are billed using the highest (and most expensive) billing code.

8        5.    EmCare's conduct violates California law, which clearly prohibits sending

9    balance bills to patients and provides that out-of-network physicians are entitled to a "reasonable

10   and customary" amount for emergency services rendered.  Anthem aids and abets in EmCare's

11   unlawful scheme by neglecting its independent duty under California law to pay a reasonable and

12   customary amount to an out-of-network physician for emergency services, by misrepresenting

13   patients' rights flowing from their insurance agreement in its materials, and by unlawfully

14   inserting the patient into the middle of billing disputes with the health care provider.  The

15   misconduct of EmCare and Anthem works in synergy to increase the chances that consumers

16   will pay a surprise bill they should have never received, for an amount to which the out-of-

17   network physician is not legally entitled.

18       6.    Plaintiff and the members of the Class (as defined below) have suffered injury

19   due to Defendants' violations of California Business & Professions Code Section 17200 *et seq.*;

20   Defendants Envision, EmCare, and EPC's breach of implied contract or quasi-contract; and

21   Defendant Anthem's breach of the covenant of good faith and fair dealing.  Plaintiff seeks

22   monetary damages, injunctive relief, restitution and/or disgorgement of profits, and attorneys'

23   fees and costs.

24                            **JURISDICTION AND VENUE**

25       7.    This Court has personal jurisdiction over Defendants because Defendants conduct

26   business in the State of California, and the actions giving rise to this complaint occurred in the

27   State of California.

28       8.    This Court has general subject matter jurisdiction pursuant to California

Constitution Article VI, Section 10.

9. This Court has personal jurisdiction over Defendants because, upon information and belief, Defendants are citizens of California, have sufficient minimum contacts in California, and/or otherwise intentionally avail themselves of the California market so as to render the exercise of jurisdiction over them by California courts consistent with traditional notions of fair play and substantial justice.

10. Venue is proper in this Court because, upon information and belief, Defendants maintains offices, have agents, employ individuals, and/or transact business in this County; a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this County; and Defendants caused harm to Plaintiff and putative Class members residing in this County.

## PARTIES

11. Plaintiff is a resident of the State of California, County of Riverside. At all times relevant hereto, Plaintiff maintained health care insurance through Anthem.

12. Defendant Envision is a provider of physician-led, medical services in the United States, and specializes in "healthcare transportation, hospital encounters and comprehensive care alternatives in various settings." *See* Envision's Form 10-K for the fiscal year ended December 31, 2015, filed with the U.S. Securities and Exchange Commission ("SEC") on February 29, 2016 ("2015 10-K") at 5.[2] As of December 31, 2015, Envision had more than 49,000 employees and affiliated clinicians. *Id.* at 7. Envision conducts its business through operating subsidiaries, including EmCare.

13. Defendant EmCare is a "leading provider of integrated facility-based physician services, including emergency, anesthesiology, hospitalist/inpatient care, radiology, tele-radiology and surgery." *Id.* at 69. EmCare employs or contracts with more than 13,000

---

[2] At the time of the filing of the 2015 10-K, Envision was incorporated as Envision Healthcare Holdings, Inc. ("EHH"). On June 15, 2016, EHH entered into an agreement and plan of merger with AmSurg Corp., pursuant to which the combined company was renamed, and currently maintains operations as, Envision Healthcare Corporation (previously defined as "Envision"). EHH and Envision are referred to collectively herein as "Envision," or "EmCare."

CLASS ACTION COMPLAINT

affiliated physicians and other clinicians to provide staffing, management, and billing services to hospitals and other medical facilities. *Id.* at 5. EmCare's wholly owned subsidiary, Reimbursement Technologies, Inc. ("RTI"), performs "substantially all of the billing for [EmCare's] affiliated physicians," and "bills and collects [payments] from each patient or the patient's insurance provider for the medical services performed." *Id.* at 10, 13. If patients do not pay their bills, RTI "forward[s] uncollected accounts electronically to outside collection agencies automatically." *Id.* at 13.

14.     Upon information and belief, Defendant EPC is an affiliate of EmCare with a contract to provide physician staffing and management services for the emergency department ("ED") at Corona Regional Medical Center ("Corona"), where Plaintiff received emergency medical services.

15.     Defendant Anthem Inc. is one of the nation's largest health benefits companies, with over 74 million people served by it and its affiliated entities. Anthem Inc.'s affiliated health care plans offer individual Affordable Care Act ("ACA") plans, administrative services only ("ASO") plans to self-funded employer groups, fully insured plans to employer groups, families and individuals, Medicare Advantage plans, Medicare Part D prescription benefit plans, and Medicaid managed care plans. One in eight Americans receive coverage for their medical care through Anthem's affiliated plans.

16.     Defendant Anthem BCBS is a subsidiary of Anthem. Anthem BCBS contracts with customers for, among other services, access to a network of providers across the country, an arrangement made possible and sustained by various other Anthem subsidiaries, including Anthem Blue Cross.

17.     Defendant Anthem Blue Cross is a subsidiary of Anthem. *See* Anthem Inc.'s Form 10-K for the fiscal year ended December 31, 2016, filed with the SEC on February 22, 2017, Exhibit 21 thereto (list of subsidiaries). Anthem Blue Cross is a leading PPO provider in almost every county throughout California, and covers more California residents than any other carrier in the state. Anthem Blue Cross is a managed health care service plan subject to the Knox-Keene Act and regulated by the California Department of Managed Health Care

("DMHC").

## FACTUAL ALLEGATIONS

### Plaintiff's Medical Emergency and Surprise Bills

18.    Plaintiff is enrolled in an employee health benefit plan funded by Plaintiff's employer, and issued by Anthem under an ASO agreement.  The cover page of the Medical Benefit Booklet provided to Plaintiff affirms that her employer's High PPO plan (the "Plan") is "[a]dministered [b]y" Anthem BCBS.

19.    ASO arrangements are commonly used by self-insured plans, where the charges for medical services (other than participants' co-payment or coinsurance obligations) are paid by the employer, but an entity such as Anthem is retained to provide specific services necessary for the provision of health benefits.  The administrative services provided to self-insured groups by Anthem include access to a network of medical care providers, claims processing and adjudication, customer service, cost-control and medical utilization management, benefits management, and other administrative services.

20.    Plaintiff's Medical Benefit Booklet specifies that Anthem was designated to provide administrative services "such as claims processing, care management, and other services, and to arrange for a network of health care providers whose services are covered by the Plan."

21.    As previously mentioned, Anthem is able to provide multi-state insurance services through its subsidiaries, as various subsidiaries are licensed to conduct insurance operations in all fifty states. Anthem's PPO plan products for corporations with a national presence who wish to self-fund health benefits for employees are dependent on a nationwide network of providers established through subsidiaries such as Anthem Blue Cross. Indeed, Anthem promotes its ASO services for self-funded plans by touting the "convenience of our expansive networks" and the opportunity to "tap into network discounts."

22.    Plaintiff and other participants in the Plan are ensured access to providers across the country.

23.    On August 31, 2016, after experiencing acute pain in her lower abdomen, Plaintiff went to the emergency room at Corona.  At that time, Plaintiff was enrolled in, and received

1    coverage under, the Plan.  Pursuant to the Plan, Corona was considered an "in-network" hospital,

2    as was its entire ED.

3         24.    Plaintiff was treated by Dr. Maciej Witkos ("Witkos") of EPC in Corona's ED.

4         25.    Unbeknownst to Plaintiff, Dr. Witkos and EDS were "out-of-network" providers

5    to her insurance company.  In other words, even though Plaintiff was being treated at an in-

6    network hospital facility, the treating physician working in the hospital was out-of-network.

7         26.    Plaintiff was told that she needed to have her gall bladder removed within 30 days

8    and was then sent home.  Thereafter, she promptly scheduled an appointment with her primary

9    care physician.

10        27.    Before the date of her primary care physician appointment, on September 2, 2016,

11   Plaintiff again experienced severe pain in her lower abdomen and returned to Corona.  She was

12   again treated in the ED by Dr. Witkos, who remembered her from her earlier visit to the ED.

13   Plaintiff remained unaware that Dr. Witkos was out-of-network.

14        28.    Following her second evaluation by Dr. Witkos, Plaintiff was told that she needed

15   her gall bladder removed immediately (i.e., she could not wait to see her primary care physician).

16   Because of her serious condition, Plaintiff was admitted to the hospital from the ED and her gall

17   bladder was surgically removed on September 4, 2016.  Plaintiff's surgeon was in-network and

18   accepted whatever Anthem paid as payment in full.

19        29.    Several weeks after her surgery, Plaintiff received two explanation of benefits

20   ("EOB") forms from Anthem regarding the treatment she received from Dr. Witkos.  Upon

21   reviewing the EOBs, Plaintiff was shocked to learn that Dr. Witkos was an out-of-network

22   physician and that Anthem was refusing to cover the vast majority of his charges, which totaled

23   over $4,400.

24        30.    The first EOB, dated September 26, 2016 ("First EOB"), listed two charges for

25   services rendered by Dr. Witkos on August 31, 2016, including a charge for "MEDICAL CARE"

26   in the amount of $2,157.00 and a charge for "OTHER MED SERVICES" in the amount of

27   $133.00. Of the total "amount charged" ($2,290), the maximum "allowable charges" Anthem

28   would pay were $526.32 for the "MEDICAL CARE" and $25.77 for the "OTHER MED

CLASS ACTION COMPLAINT

SERVICES," or $552.09 total.  Plaintiff was also required to pay a $40 copayment for the "MEDICAL CARE" and a $5.15 coinsurance payment for the "OTHER MED SERVICES," which reduced the total allowable charges Anthem would pay to $506.94.

31.     The remaining $1,737.91 charged was "not covered" by Anthem since Plaintiff's medical services were "rendered by a non-participating provider" and his charges exceeded the amount allowed by her insurance contract.  Plaintiff was warned that she was "responsible to pay the [out-of-network] provider" and that she "may be responsible [to pay] the difference between the charge amount and the paid amount."

32.     Attached to the First EOB, Plaintiff received a check from Anthem, payable to Plaintiff, in the amount of $506.94.  The EOB stated that "the attached check is to reimburse for the covered services rendered" and that Plaintiff was responsible to provide this amount to Dr. Witkos, along with whatever additional, non-covered amounts she owed.

33.     The second EOB, dated September 28, 2016 ("Second EOB"), listed a single charge for services rendered by Dr. Witkos on September 2, 2016.  The charge was identical to the first charge on the First EOB: "MEDICAL CARE" in the amount of $2,157.00.  The Second EOB also stated that Anthem's maximum "allowable charges" were $526.32, which were reduced by Plaintiff's $40.00 copayment to $486.32.

34.     The remaining $1,630.68 was "not covered" by Anthem for the same reason that similar charges were not covered under the First EOB, i.e., Dr. Witkos was out-of-network.  Attached to the Second EOB, Plaintiff received a check from Anthem, payable to Plaintiff, in the amount of $486.32.  The Second EOB stated that this check was to "reimburse for the covered services rendered," and that Plaintiff was required to provide this amount to Dr. Witkos, along with whatever additional, non-covered amounts she owed.

35.     On or about February 3, 2017, Plaintiff was sent a medical bill for the "services provided at Corona Regional Medical Center" on August 31, 2016 (the "First Bill").  The First Bill was sent by EPC on behalf of Dr. Witkos.  Like the corresponding First EOB for this treatment date, the First Bill listed two charges, for $2,157.00 and $133.00, respectively.  The descriptions of each charge were slightly different than they had been in the First EOB.  The

1    more expensive charge was for "EMERGENCY EVAL & MGMT (LVL 5)" and the less

2    expensive charge was for "EMERGENCY INTERP 12 LEAD EKG."

3          36.    Of note, the billing code on the more expensive charge was "CPT Code 99285."

4    "CPT code" means Current Procedural Terminology code, which is one of a set of medical codes

5    for health care-related procedures that is maintained by the American Medical Association. CPT

6    Code 99285 is the highest billing code available for emergency services. In other words, it is the

7    most expensive code an emergency services provider can charge.

8          37.    The First Bill stated that there were $0.00 of "payments or adjustments" to the

9    amounts charged because Anthem had paid the patient directly. Plaintiff was instructed to

10   "forward us the amount paid by our insurance." Thus, according to the First Bill, Plaintiff owed

11   Dr. Witkos the full $2,290.00, which was described as the amount of "Total Charges" and that of

12   the "Current Patient Responsibility." (There was no explanation what "our insurance" meant, or

13   whether Dr. Witkos was paid any portion of Plaintiff's copayment of coinsurance payment made

14   to Anthem.)

15         38.    On or about January 27, 2017, Plaintiff was sent a medical bill for the "services

16   provided at Corona Regional Medical Center" on September 2, 2016 (referred to herein as the

17   "Second Bill," as it covered services rendered later in time than the First Bill, notwithstanding

18   that the Second Bill was sent to Plaintiff earlier than the First Bill). The Second Bill was sent by

19   EPC on behalf of Dr. Witkos. Like the corresponding Second EOB for this treatment date, the

20   Second Bill listed a single charge, for $2,157.00. This charge was described identically to the

21   first charge on the First Bill and was for the exact same amount. This charge was also billed at

22   the highest paying emergency evaluation CPT Code, 99285. CPT Code 99285 is properly billed

23   when the presenting problem is highly severe and possible life-threatening, requiring the

24   immediate attention of a treating physician who takes a full history, makes a full examination,

25   and then engages in highly complex medical decision-making. Despite having seen the patient

26   and already having billed for the highest level of diagnostic complexity when presented with the

27   same complaint three days prior, Dr. Witkos again billed at the highest possible rate for his

28   evaluation and diagnosis.

CLASS ACTION COMPLAINT

39.     Once again, there were $0.00 of "payments and adjustments" to the amount charged on the Second Bill because Anthem had sent reimbursement to Plaintiff directly.   While Plaintiff was not explicitly instructed to forward Anthem's payment to EPC, the Second Bill represented that Plaintiff owed Dr. Witkos the full $2,157.00, which was described as the amount of "Total Charges" and that of the "Current Patient Responsibility."

40.     After receiving her bills, Plaintiff forwarded the Anthem checks to EPC and requested that it accept the checks as full satisfaction of her outstanding medical bills.   EPC refused to do so.

41.     Under the ACA's implementing regulations, insurers—including Anthem—must use one of three specified methods for calculating reimbursement for out-of-network physicians rendering emergency services and are obligated to utilize the method that results in the highest payment: (i) pay the Medicare rate; (ii) pay the median in-network amount for the service; or (iii) apply the usual formula they use to determine out-of-network reimbursement, which often depends on the "usual and customary rates" in the area.   Studies  suggest that, based on insurance reimbursement rates alone, providers who do not contract with insurance companies and thus are considered out-of-network generally receive higher reimbursement than in-network providers would for the same services—putting aside any additional sums collected through surprise bills to the patient.

42.     The reimbursement rate calculated by an insurer pursuant to ACA regulations is thus indicative of fair market value rates, i.e., the price agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts, and often will be at the high end of the range of fair market values rates.   *See supra.*

43.     Plaintiff was billed $4,447 in total for Dr. Witkos' emergency services, an amount over *eight times higher* than the $552.09 that Anthem determined, pursuant to ACA regulations, represented reasonable reimbursement.   Despite the stunning disparity—and the fact that Dr. Witkos twice charged at the highest CPT code for evaluating the same problem and reaching the same diagnosis only three days apart—EPC continued to represent that Plaintiff was responsible

9

CLASS ACTION COMPLAINT

for paying the surprise bills totaling $4,447.

44.    As previously stated, Plaintiff forwarded the checks she received from Anthem to EPC.  Plaintiff also made payments on the balance of the charges not covered by Anthem's reimbursement rate.  Although Plaintiff made payments covering a portion of her medical bills, Plaintiff's accounts were ultimately sent to a collection agency.  Plaintiff's credit report now reflects that two accounts originating with EPC have been sent to collections, each with a balance of $2,157 (despite the fact that the First Bill and the Second Bill were for different amounts, and that Plaintiff made partial payments on the accounts).  Plaintiff continues to receive calls from the collections agency.

### Surprise and Balance Billing

45.    Plaintiff's experience is all too common.  Approximately 1 in 5 privately insured patients who visit *in-network* EDs in the United States are treated by *out-of-network* physicians, and are apt to receive surprise bills for medical services not covered by their insurance companies.[3]  *See* NBER at 2.

46.    Surprise medical billing occurs when "a patient receives a bill from an out-of-network health care provider whom the patient reasonably thought would be participating in her insurer's network."  *Id*.  This practice is particularly pernicious in the in-network ED setting, as patients in "medical distress . . . do not cho[o]se and cannot avoid out-of-network doctors."  *Id*.

47.    Although patients may be able to choose the *hospitals* in which they will receive their ED services and ensure that such facilities are in-network with their insurance plans, those patients often are unaware that these in-network facilities employ out-of-network doctors.  *Id*.

---

[3] Zack Cooper, Fiona Scott Morton, & Nathan Shekita, *Surprise! Out-of-Network Billing for Emergency Care in the United States* (Nat'l Bureau of Econ. Research, Working Paper No. 23623, July 2017), copy-write © 2017 (the "NBER Working Paper" or "NBER").  Professor Zack Cooper, PhD, is an Assistant Professor of Health Policy and of Economics at Yale University.  Professor Fiona Scott Morton, PhD, is the Theodore Nierenberg Professor of Economics at the Yale University School of Management.  Nathan Shekita is a statistician/research associate at Yale University's Institution for Social and Policy Studies.  For the Court's convenience, a copy of the NBER Working Paper is attached hereto as Exhibit A.

CLASS ACTION COMPLAINT

"As a result, it is possible for a patient to choose a hospital ED that is in-network with her insurer, but receive care and a subsequent 'surprise' bill from a physician working in that ED who does not have a contract with her insurer." *Id.* As one of the authors of the NBER Working Paper told *The New York Times*, surprise billing is "'an ambushing of patients.'"[4]

48.   "[T]he potential costs that patients face if they see an out-of-network ED physician are substantial." NBER at 14. This is not just because those patients may be required to pay a greater percentage (or all) of their incurred medical costs if their bills are not covered by insurance. Rather, the total *amounts due* on their out-of-network bills are "significantly higher" than the amounts due on in-network bills, even for "identical services." NBER at 3, 8.

49.   Whereas bills from in-network physicians must reflect rates negotiated between the physicians and private insurers, Medicaid, or Medicare, "out-of-network bills reflect physician' charges, which, unlike payments for most medical services, are not set through a competitive process." *Id.* at 2. Thus, the amounts out-of-network physicians can charge are not constrained by normal market forces, i.e., they "have little correlation to their negotiated rates and are not influenced by [insurance company or government] bargaining leverage." *Id.* at 16. Moreover, because patient demand for ED physicians is relatively inelastic, the amounts out-of-network ED physicians can charge are even less constrained. *Id.* at 4, 16.

50.   According to the data analyzed by the authors of the NBER Working Paper[5], out-

---

[4] Julie Creswell, Reed Abelson & Margot Sanger-Katz, *The Company Behind Many Surprise Emergency Room Bills*, N.Y. Times, July 24, 2017, at https://nyti.ms/2tDFLQk (the "NYT Article") (quoting Professor Fiona Scott Morton, PhD). A version of the NYT Article was published in the print edition of *The New York Times* on July 25, 2017, on Page A1, under the headline "Costs Shoot Up As a Company Runs the E.R."

[5] The final dataset supporting the NBER Working Paper's findings was composed of 8,913,196 ED patient treatment episodes that took place between January 1, 2011 and December 31, 2015, which represented nearly $28 billion in aggregate ED spending. NBER at 13. 99.3% of the episodes studied occurred at in-network hospitals. *Id.* at 41 (Table 1). The data came from a single insurer that operates in all fifty states, who the NBER researchers agreed not to identify. *Id.* at 14, NYT Article. The researchers compared their findings to those of other researchers who had utilized distinct and larger data sets, and observed that the NBER findings were in-line with those of the other researchers, and were therefore "generalizab[le]." NBER at 14; *see also* NYT Article ("the national trends in surprise billing detected by the Yale team are consistent

CLASS ACTION COMPLAINT

1    of-network physicians charged, on average, $785.91 per ED visit, which was 637% of what

2    Medicare would have paid for identical services.  *Id.* at 3, 14.  By contrast, in-network

3    physicians—who agreed with insurance companies to bill at lower, negotiated rates, charged on

4    average, less than half that amount, or $326.70 per ED visit.  *Id.* at 14.  This was 266% of the

5    corresponding Medicare rates for identical services, or only 35% or so of what out-of-network

6    physicians charged, on average.  *Id.*  Assuming that insurers paid out-of-network physician bills

7    at the average prevailing in-network rates, the average patient would face a potential balance bill

8    of $448.78 per ED visit.  *Id.*

9         51.    Based on the prior discussion, it might be logical to conclude, as one insurance

10   company executive has, that "[w]hen emergency room doctors work for a company that has not

11   made a deal with an insurer, they are free to bill whatever they want . . . . 'The more they bill,

12   the more they get paid.'"  NYT Article (quoting Shara McClure, an executive with Blue Cross of

13   Texas).

14        52.    While consumers may take representations that they are responsible for the

15   totality of the billed charges at face value, especially when such statements are echoed in health

16   plan materials, California law dictates that out-of-network emergency care providers are entitled

17   to receive a "reasonable and customary amount," not whatever figure they choose to bill.

18   Moreover, they are prohibited from sending surprise balance bills to patients with Knox-Keene–

19   regulated health care service plans.  *See* discussion, *infra.*

20        53.    Moreover, disputes over the proper reimbursement rate—what is "reasonable and

21   customary"—"must be resolved solely between [the out-of-network provider and the insurance

22   company]."  Thus, when an insurance plan impermissibly involves the patient in the payment

23   process—as Anthem did here by making payments directly to Plaintiff and instructing her to

24   forward them to her out-of-network ED physician—that is also a violation of the law.  Indeed,

25   the law aims to "not involve the patient in the billing process at all."  *See* discussion, *infra.*

26

27

28

with a broader study by government researchers.").

CLASS ACTION COMPLAINT

**EmCare's Impact on ED Bills**

54.     Over the past several decades, third-party ED staffing companies have become one of the greatest sources of out-of-network surprise bills. Hospitals retain these companies to provide physicians to treat an ever-increasing volume of ED patients, manage ED affairs, and handle billing matters. Currently, approximately 70% of hospitals in the United States that operate EDs rely on third-party ED staffing companies. 2015 10-K at 7. The two most prominent national ED staffing companies, which together control 30% of the entire physician outsourcing market, are EmCare and its chief competitor, TeamHealth. NBER at 3.

55.     EmCare has contracts with over 900 clinical departments located in 42 states and the District of Columbia. 2015 10-K at 10. Once hired by a hospital to staff its ED, EmCare recruits and subcontracts with the physicians or other health care professionals that it supplies to that hospital. *Id.* at 9, 14. EmCare then determines the amounts its physicians bill for services rendered. In 2015, EmCare had approximately 18 million patient encounters and generated over $3.6 billion in net revenue. 2015 10-K at 10.

56.     ED staffing companies, like EmCare, often staff hospital EDs with out-of-network physicians, even where those hospitals are in-network to various insurance plans. This results in surprise and balance bills for ED patients. Data collected from among 194 hospitals where EmCare worked between 2011 and 2015 demonstrated that EmCare-staffed EDs had an average out-of-network billing rate of 62% (of all patient encounters). NBER at 3. This was much higher than the national average. NYT Article. It was also much higher than TeamHealth's comparable rate during that period, of only 13%. NBER at 3.

57.     Similarly, data from a different sample of hospitals that EmCare entered during the same period showed that "almost immediately after EmCare took over the management of [in-network] hospital EDs, physician out-of-network billing rates increased to nearly 100%." *Id.* at 25, 51-52 (Figure 3). Although some of these hospitals had high pre-entry out-of-network billing rates, when the sample was controlled to include only hospitals with historically low pre-entry out-of-network billing rates, EmCare's entry was shown to increase those rates by over

13
CLASS ACTION COMPLAINT

80%. *Id.* at 25, 44 (Table 4).[6]  By contrast, TeamHealth's entry resulted in a much lower increase in out-of-network billing rates of 33%. *Id.* at 4.

58.    Based on the above, the authors of the NBER Working Paper concluded that ED staff outsourcing firms were "by far the most important predictors of out-of-network billing rates across hospitals," with "out-of-network billing rates [being] significantly higher at hospitals that outsource their ED to EmCare." *Id.* at 21, 50 (Figure 2).

59.    In addition, EmCare's entry into hospitals corresponded with a 5% increase in the use of (often expensive) medical imaging tests and a 43% greater chance that patients' ED care would be billed at the highest paying billing code, CPT 99285, i.e., the same code that Plaintiff's ED care was billed (twice). *Id.* at 4, 26, 45 (Table 5).

60.    Not surprisingly, the higher out-of-network billing rates, increased use of medical imaging testing, and more frequent selection of the most expensive billing code corresponded with, on average, a 117% increase in physician payments, a 96% increase in physician charges, and an 11% increase in hospital facility payments (which was also based on a 23% increase in patient admission rates). *Id.* at 4, 26-27, 45 (Table 5).

61.    TeamHealth's entry, on the other hand, was "not associated with an increase in the rate imaging studies [that were] performed, the rate patients [were] admitted to the hospital, or the rate that physicians bill[ed] using the highest paying billing code for emergency care." *Id.* at 4.

---

[6] The before-versus-after-entry statistics included in the NBER Working Paper were based on nearly 9 million patient ED treatment episodes that occurred at a sampling of 16 hospitals across 7 health systems that the researchers could confirm EmCare entered between 2011 and 2015. NBER at 12-13.  For purposes of identifying changes in out-of-network billing rates at EmCare facilities, the 16 EmCare hospitals were divided into two groups of eight hospitals each. *Id.* at 24. The first group of hospitals had pre-entry out-of-network billing rates below 10.1%. *Id.* The second group had pre-entry out-of-network billing rates above 97.7%. *Id.*  The researchers derived their statistics for post-entry changes in out-of-network billing rates solely from the former group, as the hospitals in the latter group logically could not experience significant increases in their already near-100% rates of out-of-network billing. *Id.* All other categories of before-versus-after-entry statistics were based on the entire group of 16 EmCare facilities. *Id.* at 25.

62. The NYT Article examined EmCare's impact on particular hospitals and patients, and found it to be consistent with the statistical results discussed in the NBER Working Paper. For example, after Newport Hospital and Health Services contracted with EmCare to staff its ED in early 2016, patients noticed increased out-of-network billing rates and administrators noticed an increase in the amount of visits being billed at the highest level billing code. The average difference in physician charges per visit, and the use of the highest CPT code, were very similar to Plaintiff's experience.

> Before EmCare, about 6 percent of patient visits in the hospital's emergency room were billed for the most complex, expensive level of care. After EmCare arrived, nearly 28 percent got the highest-level billing code.

> On top of that, the hospital, Newport Hospital and Health Services, was getting calls from confused patients who had received surprisingly large bills from the emergency room doctors. Although the hospital had negotiated rates for its fees with many major health insurers, the EmCare physicians were not part of those networks and were sending high bills directly to the patients. For a patient needing care with the highest-level billing code, the hospital's previous physicians had been charging $467; EmCare's charged $1,649.

> "The billing scenario, that was the real fiasco and caught us off guard," said Tom Wilbur, the chief executive of Newport Hospital. "Hindsight being 20/20, we never would have done that." Faced with angry patients, the hospital took back control of its coding and billing.

> Newport's experience with EmCare, now one of the nation's largest physician-staffing companies for emergency rooms, is part of a pattern.

63. A doctor at Sutter Coast Hospital noticed a similar "'pattern of inflated bills and out-of-network bills'" after EmCare took over the hospital's ED in 2015. *Id.* (quoting Dr. Gregory Duncan). As a result, Dr. Duncan "joined with other elected officials in asking Sutter Coast to terminate its contract with EmCare." *Id.*

64. One specific example from Sutter Coast Hospital that was discussed in the NYT Article involved a 60-year-old patient who suffered a slip-and-fall near her home and was treated at Sutter Coast by an EmCare physician. *Id.* After her insurer covered most of her hospital bill, "[s]he was shocked to get an additional bill" for more than $500 from an out-of-network EmCare physician who she said never identified himself and only briefly examined her. "'Now I'm going to have to pay this bill off, and I can't afford to see a doctor about my high blood pressure medication. This is insane, and it's greedy.'" *Id.* (quoting the patient, Debra Brown).

65.     In addition, the NYT Article described how "EmCare's emergency management has come under scrutiny before," in a 2011 whistle-blower lawsuit brought by a former EmCare executive. *Id.* The lawsuit, which is still pending, alleges that EmCare "pressured E.R. doctors to increase admissions and tests, even when the physicians believed they were not medically necessary." *Id.* Physicians who pushed back were allegedly terminated. *Id.*

**The Knox-Keene Act and Balance Billing**

66.     California's managed care statute is the Knox-Keene Health Care Service Plan Act of 1975 (the "Knox-Keene Act"), which expressly aims "to ensure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers." Cal. Health & Safety Code § 1342(d).

67.     The Knox-Keene Act applies to health plans under the jurisdiction of the DMHC. Anthem operates under a Knox-Keene license and is subject to Knox-Keene Act provisions.[7]

68.     In a unanimous 2009 decision, the California Supreme Court held that balance billing patients for emergency medical care is forbidden under the Knox-Keene Act. *Prospect Med. Grp., Inc. v. Northridge Emergency Med. Grp.*, 198 P.3d 86, 88–89 (Cal. 2009). Interpreting the statutory scheme as a whole, the Court perceived "a clear legislative policy not to place patients in the middle of billing disputes between doctors and [health plans]." *Id.* at 92.

69.     Under the Knox-Keene Act, a plan member fulfills her obligation toward an out-of-network emergency physician by providing her insurance information promptly after the services are rendered—and any "billing disputes over emergency medical care must be resolved solely between the emergency room doctors, who are entitled to a reasonable payment for their services, and the [health care service plan], which is obligated to make that payment." *Id.* at 88-89.

70.     Accordingly, out-of-network emergency physicians cannot balance bill the patient

---

[7]     *See* Department of Managed Health Care, *View All Health Plans*, http://wpso.dmhc.ca.gov/hpsearch/viewall.aspx; Debra L. Roth & Deborah Reidy Kelch, California HealthCare Foundation, *Making Sense of Managed Care Regulation in California* 12, 21 (2001).

1   if a health plan does not pay, in whole or in part, the amount charged by emergency room

2   physicians—they must work out reimbursement with the plan. *Id*. at 88-89. The Knox-Keene

3   Act requires every health care service plan to "ensure that a dispute resolution mechanism is

4   accessible to non-contracting providers for the purpose of resolving billing and claims disputes,"

5   Cal. Health & Safety Code § 1367(h)(2), and, should dispute resolution fail, emergency

6   physicians are permitted to sue health care service plans directly over billing disputes. *See Bell*

7   *v. Blue Cross of California*, 31 Cal. Rptr. 3d 688 (Cal. Ct. App. 2005). In addition, the DMHC

8   has a Provider Complaint Unit tasked with enforcement of a provider's right to fair and timely

9   payment, and the DMHC offers an independent dispute resolution system for providers that have

10   gone through a health plan's dispute resolution process but still contest the health plan's

11   determination.

12       71.    Consistent with the California Supreme Court's interpretation of the Knox-Keene

13   Act, but while the matter was still pending, the DMHC adopted a regulation clarifying that

14   balance billing in the emergency care context is an unfair billing pattern, which regulation took

15   effect on October 15, 2008. *See* Cal. Code Regs. tit. 28, § 1300.71.39. The Supreme Court's

16   decision and DMHC regulation clearly outlaw balance billing for emergency services covered

17   under a Knox-Keene-regulated health care service plan.

18       72.    In sum, it is well-established under California law that health care plans (not

19   patients) are responsible for reimbursing out-of-network providers for emergency services, that

20   recovery for emergency services rendered is limited to a "reasonable and customary amount"

21   rather than dictated by the billed charge, and that patients may not be billed for the balance of a

22   charge if providers are unhappy with the amount of reimbursement offered by a health plan.

**CLASS ACTION ALLEGATIONS**

24       73.    All claims asserted herein are being brought pursuant to California Code of Civil

25   Procedure § 382, on behalf of a putative class of all persons residing in the State of California

26   who were provided emergency medical services at an in-network ED by an out-of-network

27   provider employed/hired by EmCare or an affiliate, and received a surprise bill from the provider

28   for an amount beyond the reasonable fair market value rates (the "Class").

17

CLASS ACTION COMPLAINT

74. Plaintiff also brings this action on behalf of the following Sub-Classes:

a. All persons residing in the State of California and enrolled in a Knox-Keene–regulated health care service plan who were provided emergency medical services at an in-network ED by an out-of-network provider employed/hired by EmCare or an affiliate, and received a surprise bill from the provider for an amount beyond the reasonable fair market value of the services rendered (the "Managed Health Care Sub-Class"); and

b. All persons residing in the State of California and enrolled in a health plan administered or insured by Anthem who were provided emergency medical services at an in-network ED by an out-of-network provider employed/hired by EmCare or an affiliate, and received a surprise bill from the provider for an amount beyond the reasonable fair market value of the services rendered (the "Anthem Sub-Class").

75. This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation, the proposed Class, Managed Health Care Sub-Class, and Anthem Sub-Class are easily ascertainable, and Plaintiff is a proper representative of the putative Class. Excluded from the Class are Defendants and their parents, subsidiaries, representatives, officers, directors, employees, partners, and co-ventures.

76. Numerosity: The members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members can be determined only by appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of Class members residing throughout California.

77. Commonality: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual Class members. Among the questions of law and fact common to the Class are:

a. Whether Defendants' conduct violates the Knox-Keene Act;

b. Whether Defendants' conduct is "unfair" within the meaning of California's Unfair Competition Law;

18
CLASS ACTION COMPLAINT

1          c.   Whether Defendants' conduct violates California's Consumers Legal Remedies

2              Act;

3          d.   Whether Defendants Envision, EmCare, and EPC breached their implied

4              contractual obligations;

5          e.   Whether the amount Defendants Envision, EmCare, and EPC are entitled to

6              charge patients is equivalent to the fair market value rates of their services;

7          f.   Whether Defendants Envision, EmCare, and EPC have been unjustly enriched by

8              their inequitable and unlawful conduct; and

9          g.   The proper measure of damages, including monetary and injunctive relief, and

10              other equitable relief.

11       78.    Typicality: Plaintiff's claims are typical of the claims of the Class, in that Plaintiff

12 experienced the harm that is alleged throughout this Complaint and was damaged thereby.

13 Plaintiff's interests are to obtain relief for herself and the Class for the harm arising out of the

14 violations of law set forth herein.

15       79.    Adequacy: Plaintiff is a member of the Class and will fairly and adequately

16 protect the interests of the other members of the Class.  Plaintiff's interests align with and do not

17 conflict with those of the other members of the Class.  Plaintiff has retained counsel competent

18 and experienced in complex consumer class action litigation and who will devote sufficient time

19 and resources to litigate this matter.

20       80.    Superiority of Class Action: A class action is superior to all other methods for the

21 fair and efficient adjudication of this controversy.  Since the damages suffered by the members

22 of the Class may be relatively small in comparison to the expense and burden of individual

23 litigation, it is virtually impossible for Plaintiff and members of the Class to individually seek

24 redress for the wrongful conduct alleged herein.  Plaintiff knows of no difficulty that will be

25 encountered in the management of this litigation that would preclude its maintenance as a class

26 action.

27       81.    As alleged herein, Defendants have acted and refused to act on grounds generally

28 applicable to the Class, thereby making appropriate final injunctive relief with respect to the

Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(Against All Defendants, on Behalf of Plaintiff and the Members of the Class)**

82.     Plaintiff realleges each of the allegations set forth in the foregoing paragraphs.

83.     Plaintiff asserts this Cause of Action against all Defendants for unlawful and unfair business practices, as defined by California Business and Professions Code, §§ 17200, *et seq.*

84.     Defendants' conduct violates California Business and Professions Code §§ 17200, *et seq.*, as the acts and practices of Defendants constitute a common and continuing course of conduct of unfair competition by means of unlawful and unfair business acts or practices within the meaning of Section 17200.

85.     Defendants' acts and practices are unlawful because they violate California law, including the Knox-Keene Act, which forbids balance billing a patient for the difference between the amount billed by the provider of emergency room services and the amount paid by the insurer for those services; put simply, it prohibits surprise bills. Defendant EPC's conduct in sending surprise bills for emergency room services, pursuant to procedures established by Defendants Envision and EmCare, to patients enrolled in Knox-Keene regulated health plans is in clear contravention of California law.  This violation of the UCL is being brought on behalf of Plaintiff and the members of the Managed Health Care Sub-Class.

86.     Defendant Anthem's policies, procedures, and written materials, as previously discussed, aid and abet unlawful balance or surprise billing.  Regardless of the terms of a health plan, which may attempt to provide for balance billing even for emergency care, it remains unlawful for a health care service plan to shift responsibility for payment to the plan member. Nonetheless, Anthem sends the check for payment to the plan member rather than the emergency physician along with an EOB that provides, "you are responsible to pay the provider." Anthem could not enforce this provision should the plan member refuse the check, but plan members are

20
CLASS ACTION COMPLAINT

1  likely to be deceived as to their rights and duties related to the billing process.  Because

2  Defendant Anthem knowingly advances and encourages an unlawful scheme that impermissibly

3  inserts patients into billing disputes over emergency services, Anthem is equally liable under

4  California law.  This violation of the UCL is being brought on behalf of Plaintiff and the

5  members of the Anthem Sub-Class.

6       87.   Defendants' conduct is not just unlawful, but is also unfair within the meaning of

7  Section 17200: it offends established public policy and is immoral, unscrupulous, unethical,

8  oppressive, and substantially injurious to consumers.  Patients receiving emergency care are

9  unable to contract for, let alone negotiate, the terms surrounding the provision of possible life-

10  saving care.  The common law has long recognized that in these special circumstances, a fair

11  contract is implied by law for the reasonable value for the services rendered. Statutory provisions

12  on the state and federal level reflect and reinforce this long-standing principle.  Defendants'

13  conduct in billing and attempting to collect fees in excess of what is reasonable, or in aiding and

14  abetting such a scheme, is unscrupulous and cynically takes advantage of consumers during a

15  time of unique vulnerability, and is especially unfair since it results in substantial injury that the

16  consumers themselves could not have reasonably avoided.  This violation of the UCL is being

17  brought on behalf of Plaintiff and the members of the Class.

18       88.   Defendants' conduct caused substantial injury to Plaintiff and members of the

19  Class. As a result of Defendants' unlawful and unfair conduct, insured patients receiving

20  emergency medical services are forced to pay surprise bills that they should have never received,

21  and that they are not obligated to pay under California law, or face collections actions and

22  damage to their credit.

23       89.   Plaintiff and the Class have suffered and continue to suffer actionable injury as a

24  direct and proximate result of Defendants' unlawful and unfair business practices.

25       90.   Plaintiff is entitled to pursue a claim against Defendants on behalf of the Class

26  pursuant to Cal. Bus. Prof. Code §§ 17203 and 17205 for restitution, equitable relief, and

27  damages to remedy Defendants' unlawful and unfair practices, and to move under Cal. Code

28  Civ. Proc. § 1021.5 for costs and attorneys' fees.

## COUNT II
### Violations of the California Consumers Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*
### (Against All Defendants, on Behalf of Plaintiff and the Members of the Class)

91.  Plaintiff realleges each of the allegations set forth in the foregoing paragraphs.

92.  Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

93.  Emergency medical care services constitute "services" under Cal. Civ. Code § 1761(b).

94.  The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of services to any consumer," which occurs when, among other instances, a person is "[r]epresenting that . . . a person has a sponsorship, status, affiliation or connection that he or she does not have," or "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions." Cal. Civ. Code §§ 1770(a)(5) and (13).

95.  Defendants have engaged in unfair or deceptive acts or practices in violation of the CLRA, including by failing to disclose and/or misrepresenting that hospital EDs that are "in-network" employ out-of-network EmCare providers. As a consequence, a reasonable consumer would be misled into believing that an in-network hospital has a contract or affiliation with his/her EmCare provider, when, in fact, that is not the case. *See* Cal. Civ. Code § 1770(a)(5). This violation of the CLRA is being brought on behalf of Plaintiff and the members of the Class.

96.  Defendant Anthem has violated the CLRA by falsely representing that patients who attended in-network hospital EDs would be charged in-network rates for medical services, when, in fact, patients were charged higher, out-of-network rates by out-of-network EmCare providers. In other words, the purported monetary benefit to patients who attended in-network hospitals, i.e., being charged lower, *negotiated* in-network rates, was not provided to those patients, which would mislead a reasonable consumer. *See* Cal. Civ. Code § 1770(a)(13). This violation of the CLRA is being brought on behalf of Plaintiff and the members of the Anthem Sub-Class.

97.  Plaintiff and the other members of the Class and the Anthem Sub-Class have

been, and continue to be, injured as a direct and proximate result of Defendants' violations of the CLRA.

98.     Plaintiff is entitled to pursue a claim against Defendants on behalf of the Class to enjoin Defendants from continuing their unfair or deceptive acts or practices under Cal. Civ. Code §§ 1780(2), (5), as well as to pursue costs and attorney's fees for bringing this action to remedy Defendants' violations of the CLRA pursuant to § 1780(e).

99.     This claim is brought for the purposes of obtaining injunctive relief.

## COUNT III
### Breach of Implied Contract or Quasi-Contract
### (Against Defendants Envision, EmCare, and EPC, on Behalf of Plaintiff and the Members of the Class)

100.     Plaintiff realleges each of the allegations set forth in the foregoing paragraphs.

101.     Plaintiff asserts this Cause of Action individually against Defendants Envision, EmCare, and EPC and on behalf of all members of the Class against Defendants Envision and EmCare.

102.     A contract is implied by law between the provider of emergency services and the Plaintiff and other members of the Class, entitling the provider to the reasonable value of the emergency services rendered.

103.     Defendants Envision and Emcare, through Defendant EPC and similar entities organized and controlled to act as mere instrumentalities, agents, or adjuncts of Defendants Envision and EmCare, breached the terms of the implied contract by billing Plaintiff and other Class members at excessive rates much higher than the reasonable value implied by law.

104.     Defendants were unjustly enriched through their breach of the implied contract, to the detriment of Plaintiff and other Class members.

105.     Defendants should be compelled to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, all proceeds received from Plaintiff and the Class as a result of any unlawful or inequitable act described herein that unjustly enriched them.  Plaintiff further seeks an order enjoining Defendants from engaging in any unlawful or inequitable acts and practices as alleged herein.

23
CLASS ACTION COMPLAINT

## COUNT IV
### Breach of the Covenant of Good Faith and Fair Dealing
**(Against Defendants Anthem, Anthem BCBS, and Anthem Blue Cross, on Behalf of Plaintiff and the Members of the Anthem Sub-Class)**

106.    Plaintiff realleges each of the allegations set forth in the foregoing paragraphs.

107.    Plaintiff asserts this Cause of Action individually and on behalf of all members of the Anthem Class against Defendant Anthem.

108.    Under California law, the covenant of good faith and fair dealing is implicit in every contract. The covenant is imposed by law to prevent a contracting party from engaging in conduct that frustrates the other party's right to the benefits of the agreement, and it is meant to effectuate the intentions of the parties.

109.    In administering health benefit plans, Anthem acts like an insurer and substantially assumes the obligations of the agreements for insurance. Insurance policies, like every other contract, contain an implied covenant of good faith and fair dealing, and Anthem owes a duty of good faith to Plaintiff and other members of the Anthem Class whose health benefit plans it administers.

110.    Defendant Anthem breached the implied covenant of good faith and fair dealing by misrepresenting Plaintiff's rights flowing from the insurance agreement and by failing to properly handle Plaintiff and other Anthem Sub-Class members' claims. Anthem's act and practices deprived and continue to deprive Plaintiff and other Anthem Sub-Class members of the expected benefits of their enrollment in a health benefit plan.

111.    Defendant Anthem engaged in, and continues to engage in, a course of conduct to further its own economic interests as opposed to the interests of the insureds whose health benefit plans it administers, continues to unjustly enrich itself, and in doing so has violated its legal obligations to make reasonable payment for emergency services and not involve the patient in any billing disputes.

112.    As a direct and proximate result of Defendant Anthem's conduct, Plaintiff and other members of the Anthem Sub-Class have been, and continue to be, injured.

CLASS ACTION COMPLAINT

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief:

a.  Certify this action as a class action pursuant to California Code of Civil Procedure § 382, appoint Plaintiff as Class representative, and designate the undersigned as Class counsel;

b.  Award Plaintiff and the Class monetary damages;

c.  Award Plaintiff and the Class equitable, declaratory, and/or injunctive relief;

d.  Award Plaintiff and the Class restitution and/or disgorgement;

e.  Grant Plaintiff and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

f.  Grant Plaintiff and the Class payment of reasonable attorneys' fees;

g.  Grant such other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff and the Class demand a trial by jury on all issues so triable.

DATED:  August 22, 2017

GLANCY PRONGAY & MURRAY LLP

By: _____
Lionel Z. Glancy
Robert V. Prongay
Jonathan M. Rotter
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

Of Counsel:
Chet B. Waldman
Patricia I. Avery
Robert Plosky
WOLF POPPER LLP
845 Third Avenue
New York, NY  10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093

*Attorneys for Plaintiff and the Proposed Class*

26
CLASS ACTION COMPLAINT