1  Lionel Z. Glancy (SBN 134180)
2  Robert V. Prongay (SBN 270796)
   Jonathan M. Rotter (SBN 234137)
3  **GLANCY PRONGAY & MURRAY LLP**
4  1925 Century Park East, Suite 2100
   Los Angeles, California 90067
5  Telephone: (310) 201-9150
   Facsimile: (310) 432-1495
6  Email: info@glancylaw.com
7
8  *Attorneys for Plaintiff and the Proposed Class*
9  [*Additional counsel on signature page*]
10
11           **UNITED STATES DISTRICT COURT**
             **CENTRAL DISTRICT OF CALIFORNIA**
12

| | |
|---|---|
| RENEE MACLAUGHLAN BOZARTH, individually and on behalf of all others similarly situated, | CASE NO. 5:17-cv-01935-FMO SHK |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| vs. | 1. VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW; |
| ENVISION HEALTHCARE CORPORATION, EMCARE HOLDINGS, INC., and EDS-I PRACTICES OF CALIFORNIA, | 2. VIOLATIONS OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; |
| Defendants. | 3. BREACH OF IMPLIED CONTRACT OR QUASI-CONTRACT. |
| | DEMAND FOR JURY TRIAL |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Renee MacLaughan Bozarth ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Envision Healthcare Corporation ("Envision"), EmCare Holdings, Inc. ("EmCare"), and EDS-I Practices of California ("EDS-I") (collectively, "Defendants"), and alleges on information and belief, except as to the allegations that pertain to Plaintiff, which are based on personal knowledge, as follows:

## INTRODUCTION

1.      Plaintiff brings this class action on behalf of all persons residing in the State of California who were provided emergency medical services at an in-network emergency department by an out-of-network provider employed by EmCare or an affiliate, and received a surprise bill for an amount beyond the reasonable fair market value rates for the services rendered.

2.      Patients across the country are being ambushed by "surprise billing," which occurs when a patient goes to a hospital that is "in-network" with his/her health insurance, only to find out weeks or months later that the doctors are "out-of-network" and their services are not covered by the patient's insurance. Unconstrained by any negotiated agreement, the out-of-network provider's services are billed at rates in excess of the reasonable fair market value of the services provided.  The result can be financially disastrous for consumers who reasonably thought they had nothing to worry about since they had obtained health insurance coverage and went to an in-network facility for treatment.

3.      Disturbingly, surprise billing is especially common in emergency rooms, where patients must act quickly under stress.  A physicians group that contracts with an in-network hospital behaves egregiously when it does not disclose its independent status and the fact that the contracted group does not take the same insurance as the hospital, and when it does not make information about what

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

insurance is accepted reasonably available.  The problem is compounded when the group then sends surprise bills for charges in excess of the fair market value of the services provided.

4. This is EmCare's *modus operandi*.  When EmCare contracts to manage a hospital's emergency department, insured patients are treated by out-of-network physicians staffed by EmCare, a fact not disclosed by EmCare; nor is it reasonably possible for patients to ascertain which insurance the emergency department physicians do accept.  Patients only discover this deception when they receive surprise bills for non-negotiated, unreasonable charges not covered by their insurance.  When EmCare enters the picture, the incidence of surprise billing increases.  Additionally, more emergency department visits are billed at the billing code denoting the highest level of medical complexity and care (which is also the most expensive option), and rates increase for services billed at the same codes.

5. EmCare's conduct violates consumer protection laws, as well as common law, which provide that in the absence of an express contract, service providers are only entitled to the reasonable value of the services rendered.  In Plaintiff's case, she was billed over $4,000 for emergency department physician services, over four times the average in-network price for the same services in the same geographic area and nearly double the average out-of-network charge for those services in that area.

6. Plaintiff and the members of the Class (as defined below) have suffered injury due to Defendants' conduct and seek monetary damages, injunctive and/or other equitable relief, restitution and/or disgorgement of profits, and attorneys' fees, costs, and expenses.

## JURISDICTION AND VENUE

7. This Court has personal jurisdiction over Defendants because

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

1    Defendants conduct business in this jurisdiction and the actions giving rise to this

2    complaint occurred in this jurisdiction.

3         8.    The class action Complaint in this action was originally filed in the

4    Superior Court of the State of California for the County of Riverside on August 22,

5    2017. This action was removed to this Court on September 22, 2017. [Dkt. 1.]

6         9.    This Court has subject matter jurisdiction over this action pursuant to

7    the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"), as the matter

8    in controversy, exclusive of interest and costs, exceeds the sum of $5,000,000, and

9    Plaintiff is bringing a class action in which members of the putative class are citizens

10   of states different from one or more Defendants. *See* Dkt. 1, pg. 3, n.3.

11        10.   Venue is proper in this Court because, upon information and belief,

12   Defendants maintain offices, have agents, employ individuals, and/or transact

13   business in this jurisdiction; a substantial part of the events or omissions giving rise

14   to Plaintiff's claims occurred in this jurisdiction; and Defendants caused harm to

15   Plaintiff and putative Class members residing in this jurisdiction.

16   **PARTIES**

17        11.   Plaintiff is a resident of the State of California, County of Riverside.

18        12.   Defendant Envision is a Delaware corporation, with its principal

19   executive offices located at 1A Burton Hills Boulevard, Nashville, Tennessee.

20   Envision has multiple subsidiaries in California and regularly conducts business in

21   the state, with business in California accounting for a significant portion of

22   Envision's physician services–related net revenue in 2016. *See* Envision Healthcare

23   Corporation's Form 10-K for the fiscal year ended December 31, 2016, filed with

24   the U.S. Securities and Exchange Commission on March 1, 2017 ("2016 10-K") at

25   3, 9, Exhibit 21.1.

26        13.   Envision is a nationwide provider of health care services and related

27

28

support services, including physician services, medical transportation services, and a range of management and  administrative services (such as clinical staffing and recruiting, scheduling support, billing and collection, operational improvement programs and risk management).  *Id.* at 1.   Envision Healthcare Corporation conducts its business through operating subsidiaries, including EmCare.[1]

14.   Defendant EmCare is a wholly owned subsidiary of Envision.  EmCare is incorporated in the State of Delaware, and EmCare's corporate headquarters are located at 13737 Noel Road, Suite 600, Dallas, Texas.  EmCare regularly conducts business in California.

15.   Defendant EmCare is a "leading provider of integrated facility-based physician services, including emergency, anesthesiology, hospitalist/inpatient care, radiology, tele-radiology and surgery."  *Id.* at 69.  EmCare contracts with hospitals to staff and manage their emergency departments.

16.   Defendant EDS-I is a corporation licensed in California, and maintains its principal executive office at 6363 South Fiddler's Green Circle, Suite 1400, Greenwood Village, Colorado.

17.   Upon information and belief, Defendant EDS-I is an affiliate of EmCare with a contract to provide physician staffing and management services for the emergency department at Corona Regional Medical Center ("Corona"), where Plaintiff received emergency medical services.

## FACTUAL ALLEGATIONS

### EmCare's Business

18.   Envision provides staffing, management, billing and other health care-related services to hundreds of facilities across the country.  *See id.*  EmCare alone

---

[1] The term "Envision" also includes all of Envision's subsidiaries and "doing business as" (d/b/a) monikers.

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

"supports hundreds of local emergency medicine practices serving hospitals, hospital systems and other healthcare organizations nationwide." *Emergency Medicine Staffing and Practice Management*, https://www.emcare.com/solutions/emergency-medicine (last visited Nov. 2, 2017).

19.   EmCare claims it can help hospitals improve emergency department management and generate greater profits.   EmCare touts on its website that "[h]elping hospitals improve emergency department management has been our core competency for more than 40 years."   EmCare, in concert with other Envision subsidiaries and affiliates, takes over and performs critical emergency department management tasks, including recruiting physicians, providing medical and support staff, arranging clinician coverage and scheduling, and billing and collecting payments from patients—purportedly offering hospital executives and administrators "immediate relief" from their "most taxing pressures." *Id.*

20.   EmCare recruits doctors by offering competitive compensation and benefits, flexible scheduling, the opportunity to practice in diverse locations, professional liability insurance and workers compensation coverage, credentialing and enrollment support, continuing education/training, and other financial benefits. On information and belief, EmCare's doctors are generally paid an hourly rate and do not directly profit from balance billing.   (Envision profits in this way, but a treating physician does not receive additional compensation when a balance bill is paid.)

21.   Envision handles billing and payment collection, including setting the rates at which patients are charged for emergency services provided by EmCare physicians, processing and mailing patient bills, collecting payments from patients, and handling billing disputes and collections actions.   Envision performs "substantially all of the billing for our employed and affiliated physicians," 2016 10-

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

K at 8, and bills patients and third-party payors directly for physician services fees. On information and belief, Envision's practice is to forward uncollected accounts to outside collection agencies if patients do not pay their bills.

**Plaintiff's Medical Emergency and Surprise Bills**

22.   On August 31, 2016, after experiencing acute pain in her lower abdomen, Plaintiff went to the emergency room at Corona. Corona was considered an "in-network" hospital under Plaintiff's medical insurance plan.

23.   Unbeknownst to Plaintiff, and undisclosed by any Defendant, Corona's emergency department was managed by EmCare and staffed by "out-of-network" EmCare providers. In other words, even though Plaintiff was being treated at an in-network hospital facility, the treating physicians working in the emergency department were out-of-network. At the time of admission, EmCare made no effort to warn patients about what it knew to be true—that the emergency department physicians do not accept the same insurance as the hospital. Beyond that, had Plaintiff tried to determine what insurance was accepted by the emergency department physicians, such information was not reasonably available to her before treatment was commenced.

24.   Plaintiff was evaluated by Dr. Maciej Witkos (the "EmCare Physician") of EDS-I in Corona's emergency department, who told Plaintiff that she needed to have her gall bladder removed within 30 days. Plaintiff was then sent home and, thereafter, promptly scheduled an appointment with her primary care physician.

25.   Before the date of her primary care physician appointment, on September 2, 2016, Plaintiff again experienced severe pain in her lower abdomen and returned to Corona. She was again treated in the emergency department by the EmCare Physician, who remembered her from her earlier visit to the emergency department. Plaintiff remained unaware that the EmCare Physician was out-of-

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

network.

26.    Following her second evaluation by the EmCare Physician, Plaintiff was told that she needed her gall bladder removed immediately (i.e., she could not wait to see her primary care physician).  Because of her serious condition, Plaintiff was admitted to the hospital from the emergency department and her gall bladder was surgically removed on September 4, 2016.  Plaintiff's surgeon was in-network.

27.    Several months after her surgery, Plaintiff received two bills from EDS-I, one for each emergency department visit.  (Nothing on the bills made clear the connection between EDS-I and the larger EmCare and Envision entities that controlled the provision of physician services and billing policies and procedures.) Upon reviewing the bills, Plaintiff was shocked to learn that the EmCare Physician had been out-of-network and that her insurance did not cover the vast majority of EmCare's charges, which totaled over $4,000.

28.    For her August 31, 2016 emergency department visit, EmCare charged Plaintiff $2,157.00, an amount reflecting services rendered at the highest paying billing code available for emergency services, "CPT Code 99285."

29.    "CPT" means Current Procedural Terminology, a medical code set maintained by the American Medical Association and designed to communicate uniform information about medical services and procedures.  *See CPT (Current Procedural Terminology)*, American Medical Association, https://www.ama-assn.org/practice-management/cpt-current-procedural-terminology.  The CPT code set is used by healthcare service providers, health insurance companies, and accreditation organizations; use of CPT codes is mandated for billing Medicare and Medicaid.  Peggy Dotson, *CPT Codes: What Are They, Why Are They Necessary, and How Are They Developed?*, Advances in Wound Care, Dec. 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3865623/.

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

30.     Emergency department visits can be billed at five codes depending on the nature of the physician services provided.  CPT Code 99285 is the most expensive code an emergency services provider can charge.  It is properly billed when the presenting problem is highly severe and possibly life-threatening, requiring the immediate attention of a treating physician who, if possible, takes a full history and performs a comprehensive examination, and then engages in highly complex medical decision making.  *Fact Sheet: CPT Code 99285*, CGS Medicare (revised Feb. 2, 2017), https://www.cgsmedicare.com/partb/mr/pdf/99285.pdf.

31.     CPT Code 99281 is properly billed when the presenting problem is of low urgency and requires little to no immediate medical care; CPT Code 99282 is properly billed when the presenting problem is of low to moderate urgency and requires low to moderate medical care; CPT Code 99283 is properly billed when the presenting problem is moderately severe and urgent, requiring immediate medical care; and CPT Code 99284 is properly billed when the presenting problem is of high severity and requires immediate care, but does not pose an immediate significant threat to life or physiologic function.  American Medical Association, *CPT 2018 Standard Codebook*.  (As discussed above, CPT Code 99285 is for the most urgent and life threatening problems.)

32.     For her September 2, 2016 ED visit, Plaintiff was charged an additional $2,157.00, also reflecting the highest paying billing code, CPT Code 99285.  In other words, despite having seen Plaintiff and already having billed for the highest level of diagnostic complexity when presented with the same complaint two days prior, the EmCare Physician's services were again billed at the highest possible rate for his subsequent evaluation and diagnosis, which merely confirmed the results of his first examination of Plaintiff, with the clarification that the gall bladder needed to be removed immediately, rather than in the next thirty days.

33.     Plaintiff's bills instructed her to forward any payments she received from her insurance company to EDS-I, and indicated that the remaining, uncovered balances were Plaintiff's "Current Patient Responsibility."

34.     As instructed, Plaintiff forwarded checks from her insurance company totaling over $500.00 per emergency department visit (or over $1,000 for two visits) to EDS-I.   Plaintiff requested that EDS-I accept the insurance checks as full satisfaction of her outstanding medical bills.  EDS-I refused to do so.

35.     Plaintiff then made additional payments on the outstanding balances of the charges not covered by her insurance.  Although Plaintiff made payments covering a portion of her medical bills, she could not pay the entire bills, and EDS-I sent her accounts to a collection agency.  Plaintiff's credit report now reflects that two accounts originating with EDS-I have been sent to collections, each with a balance of $2,157 (despite the fact that Plaintiff made partial payments on each). Plaintiff continues to receive calls from the collections agency.

**EmCare Billed Plaintiff an Unreasonable Amount for Services Rendered**

36.     The FAIR Health website provides medical cost estimates, by zip code for CPT codes, based on a database of over 24 billion health care claims paid for by private insurance plans.   *See* https://www.fairhealthconsumer.org/estimate-costs/ ("FAIR Health").  FAIR Health receives about 1.7 billion new records every year, and its database includes claims for over 10,000 services in all areas of the U.S. According to the website, as a "testament to the fairness and reliability of our data, New York, Connecticut, and many other states have adopted FAIR Health's cost information as a guidepost in laws protecting consumers, and for many other purposes."

37.     FAIR Health estimates an in-network price of $468 for an emergency department visit billed at CPT Code 99285 in the zip code where Corona is located

(92882).  Plaintiff was billed $2,157, an amount more than 4.5 times greater, for the same services.  (Even the average out-of-network uninsured price is only $1,186, roughly half of EmCare's charge.)   This demonstrates the unreasonableness of EmCare's charges.

38.   FAIR Health data suggests far lower average charges.  It also confirms that CPT Code 99285, for which EmCare billed Plaintiff, is the most costly option.  As discussed below, EmCare-managed emergency departments historically bill patients at CPT Code 99285 more often than emergency departments that are not affiliated with EmCare.

39.   Moreover, under the Patient Protection and Affordable Care Act ("ACA") implementing regulations, health insurers must use one of three specified methods for calculating reimbursement for out-of-network physicians rendering emergency services and are obligated to utilize the method that results in the highest payment: (i) pay the Medicare rate; (ii) pay the median in-network amount for the service; or (iii) apply the usual formula they use to determine out-of-network reimbursement, which often depends on the "usual and customary rates" in the area.  Studies suggest that, based on insurance reimbursement rates alone, providers who do not contract with insurance companies and thus are considered out-of-network generally receive higher reimbursement than in-network providers would for the same services—putting aside any additional sums collected through surprise bills to the patient.

40.   The reimbursement rate calculated by an insurer pursuant to ACA regulations is thus relevant to a determination of fair market value rates, i.e., the price agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts, and often will be at the high end of the range of fair market values rates.

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

41.     Plaintiff was billed $2,157 each time she was treated by the EmCare Physician, which was *more than four times greater* than the amount ($526.32) that Plaintiff's insurance company determined, pursuant to ACA regulations, represented reasonable reimbursement.

42.     Despite the stunning disparity—and the fact that Plaintiff was twice charged at the highest CPT code for the same physician evaluating the same problem (even remembering the patient) and reaching the same diagnosis only two days apart—EDS-I continued to represent that Plaintiff was responsible for paying the surprise bills totaling over $4,000.  EDS-I's charges are plainly excessive and unreasonable.

43.     Indeed, EmCare and Plaintiff had not reached any agreement in advance with respect to the fees to be charged for any emergency services rendered that were not covered by Plaintiff's insurance.  Rather, Plaintiff reasonably assumed that the services would be covered by her insurance—as she was at an in-network hospital (and it was never disclosed by any Defendant when she went to the hospital that the emergency department was managed by Emcare and would not be in-network)—or, at worst, that she would be charged fair market value rates for any uncovered services.

**Surprise and Balance Billing**

44.     Plaintiff's experience is all too common.  Approximately 1 in 5 privately insured patients who visit in-network emergency departments in the United States are treated by out-of-network physicians, and are apt to receive surprise bills for medical services not covered by their insurance companies.[2]  *See* NBER at 2.

---

[2] Zack Cooper, Fiona Scott Morton, & Nathan Shekita, *Surprise! Out-of-Network Billing for Emergency Care in the United States* (Nat'l Bureau of Econ. Research, Working Paper No. 23623, July 2017) (the "NBER Working Paper" or "NBER").  Professor Zack Cooper, PhD, is an Assistant Professor of Health Policy and of

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

45.     Surprise medical billing occurs when "a patient receives a bill from an out-of-network health care provider whom the patient reasonably thought would be participating in her insurer's network." *Id*.  This practice is particularly pernicious in the in-network emergency department setting, as patients in "medical distress . . . do not cho[o]se and cannot avoid out-of-network doctors." *Id*.

46.     Although patients may be able to choose the *hospitals* in which they will receive their emergency services and ensure that such facilities are in-network with their insurance plans, those patients often are unaware that these in-network facilities employ out-of-network doctors. *Id*.  "As a result, it is possible for a patient to choose a hospital [emergency department] that is in-network with her insurer, but receive care and a subsequent 'surprise' bill from a physician working in that [emergency department] who does not have a contract with her insurer." *Id*.  As one of the authors of the NBER Working Paper told *The New York Times*, surprise billing is "'an ambushing of patients.'"[3]

47.     "[T]he potential costs that patients face if they see an out-of-network [emergency department] physician are substantial."  NBER at 14.  This is not just because those patients may be required to pay a greater percentage (or all) of their incurred medical costs if their bills are not covered by insurance.  Rather, the total

Economics at Yale University.  Professor Fiona Scott Morton, PhD, is the Theodore Nierenberg Professor of Economics at the Yale University School of Management.  Nathan Shekita is a statistician/research associate at Yale University's Institution for Social and Policy Studies.  For the Court's convenience, a copy of the NBER Working Paper is attached hereto as Exhibit A.

[3] Julie Creswell, Reed Abelson & Margot Sanger-Katz, *The Company Behind Many Surprise Emergency Room Bills*, N.Y. Times, July 24, 2017, at https://nyti.ms/2tDFLQk (the "NYT Article") (quoting Professor Fiona Scott Morton, PhD).  A version of the NYT Article was published in the print edition of *The New York Times* on July 25, 2017, on Page A1, under the headline "Costs Shoot Up As a Company Runs the E.R."

*amounts due* on their out-of-network bills are "significantly higher" than the amounts due on in-network bills, even for "identical services."  NBER at 3, 8.

48.     Whereas bills from in-network physicians must reflect rates negotiated between the physicians and private insurers, Medicaid, or Medicare, "out-of-network bills reflect physician' charges, which, unlike payments for most medical services, are not set through a competitive process." *Id.* at 2.  Thus, the amounts out-of-network physicians charge are not constrained by normal market forces, i.e., they "have little correlation to their negotiated rates and are not influenced by [insurance company or government] bargaining leverage." *Id.* at 16.  Moreover, because patient demand for emergency department physician services is relatively inelastic, the amounts out-of-network emergency department physicians charge are even less constrained. *Id.* at 4, 16.

49.     According to the data analyzed by the authors of the NBER Working Paper,[4] out-of-network physicians charged, on average, $785.91 per emergency department visit, which was 637% of what Medicare would have paid for identical services.  *Id.* at 3, 14.  By contrast, in-network physicians—who agreed with insurance companies to bill at lower, negotiated rates, charged on average, less than half that amount, or $326.70 per emergency department visit. *Id.* at 14.  This was 266% of the corresponding Medicare rates for identical services, or only 35% or so

---

[4] The final dataset supporting the NBER Working Paper's findings was composed of 8,913,196 ED patient treatment episodes that took place between January 1, 2011 and December 31, 2015, which represented nearly $28 billion in aggregate ED spending.  NBER at 13.  99.3% of the episodes studied occurred at in-network hospitals. *Id.* at 41 (Table 1).  The data came from a single insurer that operates in all fifty states, who the NBER researchers agreed not to identify. *Id.* at 14, NYT Article.  The researchers compared their findings to those of other researchers who had utilized distinct and larger data sets, and observed that the NBER findings were in-line with those of the other researchers, and were therefore "generalizab[le]." NBER at 14; *see also* NYT Article ("the national trends in surprise billing detected by the Yale team are consistent with a broader study by government researchers.").

of what out-of-network physicians charged, on average. *Id*. Assuming that insurers paid out-of-network physician bills at the average prevailing in-network rates, the average patient would face a potential balance bill of $448.78 per emergency department visit. *Id*.

50.    Based on the prior discussion, it might be logical to conclude, as one insurance company executive has, that "[w]hen emergency room doctors work for a company that has not made a deal with an insurer, they are free to bill whatever they want . . . . 'The more they bill, the more they get paid.'" NYT Article (quoting Shara McClure, an executive with Blue Cross of Texas).

51.    While consumers may take representations that they are responsible for the totality of the billed charges at face value, out-of-network emergency care providers are entitled to receive a "reasonable and customary amount," not whatever figure the providers choose to bill.

**EmCare's Impact on Emergency Department Bills**

52.    Over the past several decades, third-party emergency department staffing companies have become one of the greatest sources of out-of-network surprise bills. Hospitals retain these companies to provide physicians to treat an ever-increasing volume of patients seeking emergency care, manage emergency department affairs, and handle billing matters. The two most prominent national emergency department staffing companies, which together control 30% of the entire physician outsourcing market, are EmCare and its chief competitor, TeamHealth. NBER at 3.

53.    Envision has physician services contracts with over 1500 clinical departments located in 45 states and the District of Columbia. 2016 10-K at 3. Once hired by a hospital to manage its emergency department, EmCare supplies physicians and other health care professionals to staff the emergency department.

Envision determines the amounts it bills for services rendered by EmCare physicians. In 2016, Envision generated over $3.6 billion in net revenue. 2016 10-K at 51.

54.    Emergency department staffing companies, like EmCare, often staff hospital emergency departments with out-of-network physicians, even where those hospitals are in-network to various insurance plans. This results in surprise balance bills for patients who must seek emergency medical care. Data collected from among 194 hospitals where EmCare worked between 2011 and 2015 demonstrated that EmCare-staffed emergency departments had an average out-of-network billing rate of 62% (of all patient encounters). NBER at 3. This was much higher than the national average. NYT Article. It was also much higher than TeamHealth's comparable rate during that period, of only 13%. NBER at 3.

55.    Similarly, data from a different sample of hospitals that EmCare entered during the same period showed that "almost immediately after EmCare took over the management of [in-network] hospital [emergency departments], physician out-of-network billing rates increased to nearly 100%." *Id*. at 25, 51-52 (Figure 3). Although some of these hospitals had high pre-entry out-of-network billing rates, when the sample was controlled to include only hospitals with historically low pre-entry out-of-network billing rates, EmCare's entry was shown to increase those rates by over 80%. *Id*. at 25, 44 (Table 4).[5] By contrast, TeamHealth's entry resulted in

---

[5] The before-versus-after-entry statistics included in the NBER Working Paper were based on nearly 9 million patient emergency department treatment episodes that occurred at a sampling of 16 hospitals across 7 health systems that the researchers could confirm EmCare entered between 2011 and 2015. NBER at 12-13. For purposes of identifying changes in out-of-network billing rates at EmCare facilities, the 16 EmCare hospitals were divided into two groups of eight hospitals each. *Id*. at 24. The first group of hospitals had pre-entry out-of-network billing rates below 10.1%. *Id*. The second group had pre-entry out-of-network billing rates above 97.7%. *Id*. The researchers derived their statistics for post-entry changes in out-of-network billing rates solely from the former group, as the hospitals in the latter group

a much lower increase in out-of-network billing rates, i.e., 33%. *Id.* at 4.

56.    Based on the above, the authors of the NBER Working Paper concluded that emergency department staffing companies were "by far the most important predictors of out-of-network billing rates across hospitals," with "out-of-network billing rates [being] significantly higher at hospitals that outsource their [emergency department] to EmCare." *Id.* at 21, 50 (Figure 2).

57.    In addition, EmCare's entry into hospitals corresponded with a 5% increase in the use of (often expensive) medical imaging tests and a 43% greater chance that patients' emergency care would be billed at the highest paying billing code, CPT 99285, i.e., the same code at which Plaintiff's emergency care was billed (twice). *Id.* at 4, 26, 45 (Table 5).

58.    Not surprisingly, the higher out-of-network billing rates, increased use of medical imaging testing, and more frequent selection of the most expensive billing code corresponded with, on average, a 117% increase in physician payments, a 96% increase in physician charges, and an 11% increase in hospital facility payments (which was also based on a 23% increase in patient admission rates). *Id.* at 4, 26-27, 45 (Table 5).

59.    TeamHealth's entry, on the other hand, was "not associated with an increase in the rate imaging studies [that were] performed, the rate patients [were] admitted to the hospital, or the rate that physicians bill[ed] using the highest paying billing code for emergency care." *Id.* at 4.

60.    The NYT Article examined EmCare's impact on particular hospitals and patients, and found it to be consistent with the statistical results discussed in the

---

logically could not experience significant increases in their already near-100% rates of out-of-network billing. *Id.* All other categories of before-versus-after-entry statistics were based on the entire group of 16 EmCare facilities. *Id.* at 25.

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

NBER Working Paper.  For example, after Newport Hospital and Health Services contracted with EmCare to staff its emergency department in early 2016, patients noticed increased out-of-network billing rates and administrators noticed an increase in the amount of visits being billed at the highest level billing code.  The average difference in physician charges per visit, and the use of the highest CPT code, were very similar to Plaintiff's experience.

> Before EmCare, about 6 percent of patient visits in the hospital's emergency room were billed for the most complex, expensive level of care. After EmCare arrived, nearly 28 percent got the highest-level billing code.

> On top of that, the hospital, Newport Hospital and Health Services, was getting calls from confused patients who had received surprisingly large bills from the emergency room doctors. Although the hospital had negotiated rates for its fees with many major health insurers, the EmCare physicians were not part of those networks and were sending high bills directly to the patients. For a patient needing care with the highest-level billing code, the hospital's previous physicians had been charging $467; EmCare's charged $1,649.

> "The billing scenario, that was the real fiasco and caught us off guard," said Tom Wilbur, the chief executive of Newport Hospital. "Hindsight being 20/20, we never would have done that." Faced with angry patients, the hospital took back control of its coding and billing.

> Newport's experience with EmCare, now one of the nation's largest physician-staffing companies for emergency rooms, is part of a pattern.

61.    A doctor at Sutter Coast Hospital ("Sutter Coast") noticed a similar "'pattern of inflated bills and out-of-network bills'" after EmCare took over the hospital's emergency department in 2015.  *Id*. (quoting Dr. Gregory Duncan).  As a result, Dr. Duncan "joined with other elected officials in asking Sutter Coast to terminate its contract with EmCare."  *Id*.

62.    One specific example from Sutter Coast that was discussed in the NYT Article involved a 60-year-old patient who suffered a slip-and-fall near her home and was treated at Sutter Coast by an EmCare physician.  *Id*.  After her insurer covered most of her hospital bill, "[s]he was shocked to get an additional bill" for

more than $500 from an out-of-network EmCare physician who she said never identified himself and only briefly examined her. "'Now I'm going to have to pay this bill off, and I can't afford to see a doctor about my high blood pressure medication. This is insane, and it's greedy,'" *Id.*, (quoting the patient).

63.     In addition, the NYT Article described how "EmCare's emergency management has come under scrutiny before," in a 2011 whistle-blower lawsuit brought by a former EmCare executive. *Id.* The lawsuit, which is still pending, alleges that EmCare "pressured E.R. doctors to increase admissions and tests, even when the physicians believed they were not medically necessary." *Id.* Physicians who pushed back were allegedly terminated. *Id.*

## CLASS ACTION ALLEGATIONS

64.     All claims asserted herein are being brought on behalf of a class of all persons residing in the State of California who were provided emergency medical services at an in-network emergency department by an out-of-network provider employed by EmCare or an affiliate, and received a surprise bill from the provider for an amount beyond the reasonable fair market value rates (the "Class").

65.     This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiff is a proper representative of the putative Class. Excluded from the Class are Defendants and their parents, subsidiaries, representatives, officers, directors, employees, partners, and co-ventures.

66.     Numerosity: The members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members can be determined only by appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of Class members residing throughout California.

67.   <u>Commonality</u>: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual Class members.   Among the questions of law and fact that predominate and are common to the Class are:

    a.   Whether Defendants' conduct violates California's Unfair Competition Law;

    b.   Whether Defendants' conduct violates California's Consumers Legal Remedies Act;

    c.   Whether Defendants breached their implied contractual obligations;

    d.   What can a service provider charge a patient where there is no express contract between them:  whatever the service provider wishes to charge, the quantum meruit or fair market value of the services, or another measure;

    e.   Whether Defendants have been unjustly enriched by their inequitable and unlawful conduct; and

    f.   The proper measure of damages, including monetary and injunctive relief, and other equitable relief.

68.   <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Class, in that Plaintiff experienced the harm that is alleged throughout this Complaint and was damaged thereby.  Plaintiff's interests are to obtain relief for herself and the Class for the harm arising out of the violations of law set forth herein.

69.   <u>Adequacy</u>: Plaintiff is a member of the Class and will fairly and adequately protect the interests of the other members of the Class.  Plaintiff's interests align with and do not conflict with those of the other members of the Class. Plaintiff has retained counsel competent and experienced in complex consumer class action litigation and who will devote sufficient time and resources to litigate this

matter.

70.    <u>Superiority of Class Action</u>: A class action is superior to all other methods for the fair and efficient adjudication of this controversy.   Since the damages suffered by the members of the Class may be relatively small in comparison to the expense and burden of individual litigation, it is virtually impossible for Plaintiff and members of the Class to individually seek redress for the wrongful conduct alleged herein.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

71.    As alleged herein, Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

**CAUSES OF ACTION**

**COUNT I**

**Violations of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

72.    Plaintiff realleges each of the allegations set forth in the foregoing paragraphs.

73.    Plaintiff asserts this Cause of Action against Defendants for unlawful and unfair business practices, as defined by California Business and Professions Code, §§ 17200, *et seq.*, California's Unfair Competition Law (the "UCL").

74.    Defendants' conduct violates the UCL, as the acts and practices of Defendants constitute a common and continuing course of conduct by means of "unlawful" and "unfair" business acts or practices within the meaning of the UCL.

75.    Defendants' conduct is "unlawful" pursuant to the UCL because it violates the California Legal Remedies Act (as discussed below).

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

76.     Defendants' conduct is not just unlawful, but also "unfair" within the meaning of the UCL, as it is immoral, unscrupulous, unethical, oppressive, and substantially injurious to California consumers of medical services, i.e., patients, and/or offends established public policy.  Defendants contract with hospitals to manage and staff their emergency departments, as was the case with the emergency department at Corona, where Plaintiff was treated.     Envision takes over administrative and billing functions of the hospital emergency departments it manages and contracts with insurance carriers on behalf of the EmCare providers that staff the emergency department.  Envision therefore knows or should know that its physicians within the emergency department do not accept the same insurance plans as the emergency department itself.  By not informing patients that they will likely receive bills for out-of-network physician emergency services even though it is an in-network emergency department, and not informing patients how they can find out if providers are in fact in-network, Defendants violate the UCL.

77.     Defendants also violate the UCL by billing patients for charges that far exceed the reasonable and fair value of the services rendered.  Patients receiving emergency care are unable to contract for, let alone negotiate, the terms surrounding the provision of possible life-saving care.  The common law has long recognized that in these special circumstances, a fair contract is implied by law for the reasonable value for the services rendered.  Statutory provisions on the state and federal level reflect and reinforce this long-standing principle.  Defendants' conduct in billing and attempting to collect fees in excess of what is reasonable, particularly without disclosing to patients in advance that the doctors are out-of-network, is unscrupulous and cynically takes advantage of patients during a time of unique vulnerability, and is especially unfair since it results in substantial injury that the patients themselves could not have reasonably avoided.

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK

78.     Plaintiff and the other members of the Class have been, and continue to be, injured as a direct and proximate result of Defendants' violations of the UCL.

79.     Plaintiff is entitled to pursue a claim against Defendants on behalf of the Class pursuant to Cal. Bus. Prof. Code §§ 17203 and 17205 for restitution, equitable relief, and damages to remedy Defendants' unlawful and unfair practices, and to move under Cal. Code Civ. Proc. § 1021.5 for costs and attorneys' fees.

80.     Out of an abundance of caution, Plaintiff hereby incorporates the allegations and remedies sought in Count III, below, with and into this Count I and Count II.

## COUNT II

### Violations of the California Consumers Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*

81.     Plaintiff realleges each of the allegations set forth in the foregoing paragraphs.

82.     Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

83.     Emergency medical care services constitute "services" under Cal. Civ. Code § 1761(b).

84.     The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of services to any consumer," which occurs when, *among other instances enumerated in the CLRA*, a consumer is led to believe that: "a person has a sponsorship, status, affiliation or connection that he or she does not have," Cal. Civ. Code § 1770(a)(5); or "a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law," § 1770(a)(14). The CLRA has been interpreted by courts to outlaw both representations *and omissions* of material fact that are likely to mislead

reasonable consumers.

85.    When an insured patient goes to an in-network hospital emergency department managed and staffed by Defendants, the patient will likely be treated by an out-of-network physician and subsequently receive a large surprise bill for the physician's services.  Defendants are or should be aware of this fact, as they control key aspects of the emergency department's services, including staffing and billing matters (which even their physicians do not control).  However, Defendants do not disclose any of this information to patients, although these facts would be material to the reasonable consumer.

86.    While a treating physician is only entitled to the reasonable value of his or her services absent an express contractual relationship with the patient, Defendants charge rates far above fair market value, and demand patients pay the difference between the billed charges and the reasonable reimbursement rate calculated and covered by the patient's insurer.  Defendants' misrepresentations and/or failures to disclose are misleading to the reasonable consumer who goes to an in-network hospital for emergency medical attention expecting that the emergency department physician's services will be covered and/or billed at a reasonable rate, and the Class has suffered harm as a result.  As such, Defendants have engaged in unfair or deceptive acts or practices in violation of the CLRA.

87.    Plaintiff and the other members of the Class have been, and continue to be, injured as a direct and proximate result of Defendants' violations of the CLRA.

88.    On September 15, 2017, Plaintiff served each of the Defendants with written notice of their CLRA violations pursuant to Cal. Civ. Code § 1782, via letters sent by certified mail, return receipt requested.  After the requisite thirty days, Defendants failed to respond to any of the CLRA notice letters, and did not make any appropriate correction, repair, replacement, or other remedy.  Pursuant to Cal.

Civ. Code § 1782, Plaintiff is thus entitled to seek damages at this time.

89.     Plaintiff is also entitled to pursue a claim against Defendants on behalf of the Class to enjoin Defendants from continuing their unfair or deceptive acts or practices under Cal. Civ. Code §§ 1780(a)(2), (5); to recover actual damages under § 1780(a)(1); as well as to pursue costs and attorneys' fees for bringing this action to remedy Defendants' violations of the CLRA pursuant to § 1780(e).

## COUNT III

### Breach of Implied Contract or Quasi-Contract

90.     Plaintiff realleges each of the allegations set forth in the foregoing paragraphs.

91.     A contract is implied by law between the provider of emergency services and the Plaintiff and other members of the Class, entitling the provider to the fair market or reasonable value of the emergency services rendered (the *quantum meruit* of the services performed).

92.     Defendants Envision and EmCare, through Defendant EPC and similar entities organized and controlled to act as mere instrumentalities, agents, or adjuncts of Defendants Envision and EmCare, breached the terms of the implied contract by billing Plaintiff and other Class members at excessive rates much higher than the reasonable value implied by law.

93.     Defendants were unjustly enriched through their breach of the implied contract, to the detriment of Plaintiff and other Class members.

94.     Defendants should be compelled to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, all proceeds received from Plaintiff and the Class as a result of any unlawful or inequitable act described herein that unjustly enriched them.

95.     Plaintiff further seeks an order enjoining Defendants from engaging in

any unlawful or inequitable acts and practices as alleged herein, because of Defendants' continuing misrepresentations and improper billing practices.

96.    There is no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief:

a.  Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiff as Class representative, and designate the undersigned as Class counsel;

b.  Award Plaintiff and the Class monetary damages;

c.  Award Plaintiff and the Class equitable, declaratory, and/or injunctive relief;

d.  Award Plaintiff and the Class restitution and/or disgorgement;

e.  Grant Plaintiff and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

f.  Grant Plaintiff and the Class payment of reasonable attorneys' fees;

g.  Grant such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff and the Class demand a trial by jury on all issues so triable.

DATED:  November 10, 2017          Respectfully submitted,
                                   /s/ Jonathan M. Rotter
                                   Lionel Z. Glancy (SBN 134180)
                                   Robert V. Prongay (SBN 270796)
                                   Jonathan M. Rotter (SBN 234137)
                                   **GLANCY PRONGAY & MURRAY LLP**
                                   1925 Century Park East, Suite 2100
                                   Los Angeles, California 90067
                                   Telephone: (310) 201-9150
                                   Facsimile: (310) 432-1495
                                   Email: info@glancylaw.com

Of Counsel:

_____

Chet B. Waldman (admitted *Pro Hac Vice*)
Patricia I. Avery
Robert Plosky
Elissa Hachmeister
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093
Email: cwaldman@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*

## PROOF OF SERVICE BY ELECTRONIC POSTING

*Bozarth v. Envision Healthcare Corp., Case No. 5:17-cv-01935-FMO-SHK*

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. I am employed with Wolf Popper LLP, whose offices are located in the City and State of New York. My business address is: 845 Third Avenue, New York, New York 10022.

On November 11, 2017, I served true and correct copies of the foregoing document entitled AMENDED CLASS ACTION COMPLAINT in this action, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 11, 2017, at New York, New York.

By: */s/ Chet B. Waldman*

Chet B. Waldman

AMENDED CLASS ACTION COMPLAINT
Case No.: 5:17-cv-01935-FMO-SHK