Lionel Z. Glancy (SBN 134180)
Robert V. Prongay (SBN 270796)
Jonathan M. Rotter (SBN 234137)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

Chet B. Waldman (admitted *Pro Hac Vice*)
**WOLF POPPER LLP**
845 Third Avenue 12th Floor
New York, NY 10022
Telephone: (212) 759-4600
Fax: (212) 486-2093
Email: cwaldman@wolfpopper.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENEE MACLAUGHLAN BOZARTH, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>    vs.<br><br>ENVISION HEALTHCARE CORPORATION, EMCARE HOLDINGS, INC., and EDS-I PRACTICES OF CALIFORNIA,<br><br>                  Defendants. | Case No. 5:17-CV-1935 FMO (SHKx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>**[FED. R. CIV. P. 12(c)]**<br><br>Date: February 22, 2018<br>Time: 10:00 a.m.<br>Courtroom: 6D<br>Judge: Hon. Fernando M. Olguin<br><br>Oral Argument Requested |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

I.  INTRODUCTION ........................................................................1

II.  FACTUAL BACKGROUND ........................................................2

III.  LEGAL STANDARD ..................................................................7

IV.  ARGUMENT ...............................................................................7

    A.  ERISA Does Not Preempt Plaintiff's Claims. ...........................7

    B.  Plaintiff Has Stated Claims Under the CLRA and UCL. .........11

    C.  Plaintiff Adequately Alleges Defendants' Breach of Implied Contract. ..................................................................................18

    D.  The Factual Allegations Sufficiently Support the Claims Against Defendants EmCare and Envision................................20

V.  CONCLUSION ..........................................................................21

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Cases**

4

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
   121 F. Supp. 3d 950 (C.D. Cal. 2015)......................................................... 8, 11, 13

5

*Bell Atlantic v. Twombly*,
   550 U.S. at 555 (2007)...........................................................................................20

6

7

*Beltran v. Avon Prod., Inc.*,
   2012 WL 12303423 (C.D. Cal. Sept. 20, 2012)....................................................15

8

*Blue Cross of California v. Anesthesia Care Associates Med. Grp., Inc.*,
   187 F.3d 1045 (9th Cir. 1999) ...............................................................................11

9

10

*Botsford v. Blue Cross & Blue Shield of Montana, Inc.*,
   314 F.3d 390 (9th Cir. 2002) ...................................................................................9

11

*Burdick v. Union Sec. Ins. Co.*,
   2009 WL 4798873 (C.D. Cal. Dec. 9, 2009)........................................................11

12

13

*Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*,
   519 U.S. 316 (1997) ............................................................................................8, 9

14

*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
   20 Cal. 4th 163 (1999) ..................................................................................... 14, 15

15

16

*Children's Hosp. Cent. California v. Blue Cross of California*,
   226 Cal. App. 4th 1260 (2014) ..............................................................................18

17

*Collins v. eMachines, Inc.*,
   202 Cal. App. 4th 249, 255 (2011) ........................................................................12

18

19

*Dishman v. UNUM Life Ins. Co. of Am.*,
   269 F.3d 974 (9th Cir. 2001) ...................................................................................7

20

*Durrell v. Sharp Healthcare*,
   183 Cal. App. 4th 1350 (2010) ..............................................................................19

21

22

*Egelhoff v. Egelhoff ex rel. Breiner*,
   532 U.S. 141 (2001) .................................................................................................8

23

*Engalla v. Permanente Medical Group, Inc.*,
   15 Cal. 4th 951 (1997) ...........................................................................................12

24

25

*Falk v. Gen. Motors Corp.*,
   496 F. Supp. 2d 1088 (N.D. Cal. 2007)............................................................ 12, 13

26

*Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist
   Congregational Church*,
   887 F.2d 228 (9th Cir. 1989) .................................................................................20

27

28

*Golden Gate Rest. Ass'n v. City & County of San Francisco*,
   546 F.3d 639 (9th Cir. 2008) ........................................................................8

*Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*,
   896 F.2d 1542 (9th Cir. 1989) .....................................................................7

*Hale v. Sharp Healthcare*,
   183 Cal. App. 4th 1373 (2010) ...................................................................19

*Howell v. Hamilton Meats & Provisions, Inc.*,
   52 Cal. 4th 541 (2011) ...............................................................................18

*In re Dynamic Random Access Memory Antitrust Litig.*,
   516 F. Supp. 2d 1072 (N.D. Cal. 2007) ......................................................21

*In re Palmdale Hills Prop., LLC v. Argent Mgmt., LLC*,
   2017 Bankr. LEXIS 2162 (Bankr. C.D. Cal. Aug. 2, 2017) ........................19

*Kaplan v. Rose*,
   49 F.3d 1363, 1370 (9th Cir. 1994) ............................................................21

*Levitt v. Yelp! Inc.*,
   765 F.3d 1123 (9th Cir. 2015) ....................................................................20

*Lozano v. AT & T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ......................................................................16

*Mass. Mut. Life Ins. Co. v. Superior Court*,
   97 Cal. App. 4th 1282 (2002) .....................................................................13

*McGann v. Ernst & Young*,
   102 F.3d 390 (9th Cir. 1996) ........................................................................7

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ......................................................................21

*McKell v. Wash. Mut. Inc.*,
   142 Cal. App. 4th 1457 (2006) ...................................................................17

*Moran v. Prime Healthcare Mgmt., Inc.*,
   3 Cal. App. 5th 1131 (2016) .......................................................................15

*Munson v. Del Taco, Inc.*,
   46 Cal. 4th 661 (2009) ................................................................................14

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995) .............................................................................. 7, 8, 9

*Palmer v. Gregg*,
   65 Cal. 2d 657 (1967) .................................................................................18

*Paulsen v. CNF Inc.*,
   559 F.3d 1061 (9th Cir. 2009) ...................................................................8, 9

*Pirozzi v. Apple, Inc.*,
    966 F. Supp. 2d 909 (N.D. Cal. 2013)................................................................16

*Providence Health Plan v. McDowell*,
    385 F.3d 1168 (9th Cir. (2004).........................................................................9

*Robbins v. Town of Homer*,
    103 N.W. 1023 (Minn. 1905).............................................................................18

*Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson*,
    201 F.3d 1212 (9th Cir. 2000)...........................................................................8

*Sarun v. Dignity Health*,
    232 Cal. App. 4th 1159 (2014), as modified (Jan. 13, 2015)...........................20

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983)..............................................................................................8

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
    72 Cal. App. 4th 861 (1999).............................................................................16

*Steroid Hormone Product Cases*,
    181 Cal. App. 4th 145 (2010).............................................................................13

*Tseng v. Nordstrom, Inc.*,
    2016 WL 7403288 (C.D. Cal. Dec. 19, 2016)..............................................7, 21

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)..............................................................................7


**Statutes**

Cal. Bus. & Prof. Code, § 17200 .............................................................................14

Cal. Civ. Code § 1770(a) ........................................................................................11

Cal. Code Regs. Tit. 28, § 1300.71(a)(3)(B) .........................................................18

**Other Authorities**

*Doug Webster, DO, FACEP, FACOEP-D*, Envision Physician Services,
    https://www.emcare.com/about/leadership/doug-webster,-do,-facep,-facoep-d
    (last visited Jan. 24, 2018)................................................................................21

*Paul Silka, MD, FACEP*, Envision Physician Services,
    https://www.emcare.com/about/leadership/paul-silka,-md,-facep (last visited Jan.
    24, 2018)..........................................................................................................21

Richard A. Posner, *Economic Analysis of Law* (6th ed. 2003)...............................18

## I.    **INTRODUCTION**

Defendants' brief reflects a fundamental misunderstanding of Plaintiff's claims and the facts and law that underpin them.[1] Defendants believe this case is about Plaintiff's failure to read and understand her health insurance plan. But there is no dispute over the terms of her plan or whether her insurer properly provided the benefits due under it. The real issue is that Defendants make it impossible for consumers to determine whether the emergency department doctors at in-network hospitals are actually out-of-network—and then charge inflated rates beyond the fair market value of the services provided, services that consumers did not, and indeed could not, know were out-of-network.

Defendants know when their doctors are not in-network to the same insurance plans as the hospital emergency departments that Defendants run; Defendants know that they do not provide the information consumers need to find out if the emergency room doctors are in fact out-of-network; and Defendants know that when consumers do unwittingly receive out-of-network care at an in-network hospital, they will be hit with substantial bills based on rates unilaterally set by Defendants, rates consumers did not have access to, nor agreed to. But apparently Defendants think all of this is fine because they make no effort to provide the information consumers need to avoid balance bills for out-of-network provider services.

There are simple measures that Defendants could easily take to avoid misleading customers, bringing their behavior in conformity with the requirements of the law (and basic human decency). They could hang a sign in the emergency department stating that the emergency department doctors do not participate in the same insurance networks as the hospital itself and make available a list of the

---

[1] Unless otherwise specified herein, all capitalized terms shall have the same meaning as defined in Plaintiff's Amended Class Action Complaint filed November 11, 2017 (ECF No. 23) ("Complaint"). "¶" denotes paragraphs in the Complaint.

networks the emergency department doctors do participate in. At a minimum, Defendants must clearly disclose the name of the physician group providing emergency department services, as a consumer cannot ascertain coverage without this information.  Defendants cry that Plaintiff demands too much; to be fair, perhaps any effort seems herculean when your current strategy is to deny that there is a problem and then do nothing.

But the law obliges Defendants to do better. It is a longstanding common law principle that when a patient receives emergency medical care and does not have time, ability, opportunity, or information needed to negotiate the terms of the transaction, a fair contract is implied by law and the provider is entitled to reasonable value of the services rendered, not whatever the provider feels like charging. The CLRA and UCL, enacted to protect consumers from the kinds of abuses at the center of this case, require the disclosure of material information that Defendants are in a superior position to know when consumers would otherwise be misled. Defendants' practices are unfair, unlawful, and indefensible; the motion for judgment on the pleadings should be denied.

## II.   **FACTUAL BACKGROUND**

Patients across the country are being ambushed by "surprise billing," which occurs when a patient goes to a hospital that is "in-network," only to find out weeks or months later that the health care providers are "out-of-network" and their services are not covered by the patient's insurance.  ¶¶ 44-46.  Unconstrained by any negotiated agreement, the out-of-network provider's services are billed at rates in excess of the reasonable fair market value of the services provided.  ¶¶ 47-49.  The result can be financially disastrous for consumers who obtained health insurance, paid their premiums, and elected to receive treatment at an in-network facility in an effort to control their health care costs.  ¶ 2.  Disturbingly, surprise billing is

especially common in emergency rooms, where patients are especially vulnerable. ¶¶ 3, 45.

Many hospitals rely on third-party entities to run their emergency departments, but only a small fraction end up experiencing problems with rampant surprise (or balance) emergency department bills (i.e., patients visit an in-network hospital emergency department and later receive a large bill for out-of-network services received there). ¶¶ 52, 54-56. A company that contracts with a hospital to run the hospital's emergency department acts unlawfully when it does not disclose that the emergency department is run by a company other than the hospital, that the emergency department physicians are not hospital employees and are not in-network to all the same plans as the hospital itself, and does not disclose the name of the physician group providing the services, which information is necessary for a consumer to find out whether the emergency department physicians participate in her network, or, in the alternative, does not disclose which insurance plans its emergency department physicians do take. The problem is compounded when the physician-staffing company then sends bills for charges in excess of the fair market value of the services provided.

This has been Envision/EmCare's *modus operandi*. ¶ 4. Defendants are in the business of operating and staffing emergency departments for hospitals: they provide physician staffing and administrative and management services, including recruiting and placing health care providers and nonclinical personnel, contracting with insurance carriers on behalf of providers, setting the rates at which patients are charged for emergency services provided by Defendants' physicians, and handling billing and collection of payments.[2]  When Defendants manage a hospital's

---

[2] Defendant Envision is a nationwide provider of health care services and related support services, including physician services and a range of management and administrative services (such as clinical staffing and recruiting, scheduling support, billing and collection, operational improvement programs and risk management), and conducts its business through operating subsidiaries and affiliates, such as Defendants

emergency department, insured patients are treated by out-of-network physicians, information not disclosed by Defendants, who in fact make it impossible for patients to ascertain which insurance the emergency department physicians do accept.  ¶ 4. Patients then receive bills for non-negotiated, unreasonable charges not covered by their insurance.  ¶¶ 4-5.

Plaintiff's experience is typical.  After suffering acute pain in her lower abdomen, Plaintiff went to the emergency room at Corona Regional Medical Center ("Corona"), which was in-network under her medical insurance plan according to her insurer's website.  ¶ 22.  Unbeknownst to Plaintiff, and undisclosed by Defendants, Corona's emergency department was managed by Defendants and staffed by out-of-network providers.  ¶¶ 17, 23.  As was also their uniform practice, Defendants made no efforts whatsoever to warn patients that the emergency department physicians did not accept the same insurance as the hospital itself, nor did they make reasonably available information that would allow a patient to ascertain coverage.  ¶ 23.

Plaintiff was evaluated by an emergency department physician who told her that she would need to have her gall bladder removed within thirty days.  ¶ 24.  She was sent home and promptly scheduled an appointment with her primary care physician.  *Id.*  However, Plaintiff ended up returning to the Corona emergency department only two days later, once again with severe pain in her lower abdomen.

EmCare and EDS-I.  ¶¶ 13-16, 18; *see* Envision Healthcare Corporation's Form 10-K for the fiscal year ended December 31, 2016, filed with the U.S. Securities and Exchange Commission on March 1, 2017 ("2016 10-K") at 3 ("We, or our affiliated entities, recruit and hire or contract with physicians and other healthcare professionals, who then provide services to patients in the facilities with which we contract. We bill and collect from each patient or the patient's insurance provider for the medical services performed. We also … provide management services such as billing and collection, recruiting, risk management and certain other administrative services."). Defendant EmCare is a wholly owned subsidiary of Envision, while EDS-I is an affiliate.  ¶¶ 14, 17.  Business in California accounted for a significant portion of Defendant Envision's physician services segment net revenue in 2016.  ¶ 12.

¶ 25.  Plaintiff was treated by the same emergency department physician who had evaluated her before (and who remembered her from her earlier visit).  *Id.*  Plaintiff remained unaware that the physician was out-of-network.  *Id.*

Plaintiff was told she would need her gall bladder removed immediately and was admitted to the hospital from the emergency department.  Her gall bladder was surgically removed two days later.  ¶ 26.

Several months after her surgery, Plaintiff received two bills that on their face appeared to be from EDS-I, one for each emergency department visit.  ¶ 27.  On reviewing the bills, Plaintiff was shocked to learn that the emergency department physician was out-of-network and thus her insurance did not cover the vast majority of charges for the physician's services, which totaled over $4,000.  *Id.*

For both visits, Defendants billed for emergency department physician services at the highest-level billing code, CPT Code 99285, reflecting the most complex and expensive level of care.  ¶¶ 28, 30, 32.  For each visit billed at CPT Code 99285, Plaintiff was charged $2,157.  ¶¶ 28, 32.  This charge is *more than 4.5 times greater* than the average in-network price for an emergency department visit billed at CPT Code 99285 in the zip code where Corona is located, and even the average out-of-network (and thus non-negotiated) uninsured price is roughly half the amount Plaintiff was charged.[3]  ¶ 37.  The billed charge was also more than four

---

[3] This data is from FAIR Health, an independent website that provides medical cost estimates for a specific CPT code in a particular zip code based on a database of over 24 billion health care claims paid for by private insurance plans.  *See* https://www.fairhealthconsumer.org/estimate-costs/ ("FAIR Health").  FAIR Health receives about 1.7 billion new records every year, and its database includes claims for over 10,000 services in all areas of the U.S.  According to the website, as a "testament to the fairness and reliability of our data, New York, Connecticut, and many other states have adopted FAIR Health's cost information as a guidepost in laws protecting consumers, and for many other purposes."  ¶ 36.

times greater than the amount that Plaintiff's insurance company determined represented reasonable reimbursement.[4] ¶ 41.

Plaintiff received checks from her insurance company for $526.32 for each emergency visit, and Plaintiff tendered these amounts to Defendants as payment for her medical bills. ¶¶ 34, 41. However, Defendants continued to represent that Plaintiff was responsible for paying the balance bills totaling over $4,000, and Defendants sent Plaintiff's accounts to collections. ¶¶ 34, 35.

Defendants never disclosed that the Corona emergency department was managed by Defendants and that the emergency department providers did not accept the same insurance as the hospital itself. ¶ 23. Plaintiff did not have full information, let alone an opportunity to negotiate, and she never reached any agreement with Defendants regarding fees to be charged for any emergency services rendered. ¶ 43. Instead, Plaintiff reasonably assumed that the services would be covered by her insurance—as she was at an in-network hospital and Defendants did not disclose the material facts that they were in a superior position to know (e.g., that they were not in-network to the same insurance providers as the hospital, and what providers they were actually in-network to)—or, at worst, that she would be charged fair market value rates for any uncovered services. *Id.*

---

[4] Under the Patient Protection and Affordable Care Act implementing regulations, health insurers must use one of three specified methods for calculating reimbursement for out-of-network physicians rendering emergency services and are obligated to utilize the method that results in the highest payment: (i) pay the Medicare rate; (ii) pay the median in-network amount for the service; or (iii) apply the usual formula they use to determine out-of-network reimbursement, which often depends on the "usual and customary rates" in the area. ¶ 39. Studies indicate that, based on insurance reimbursement rates alone, providers who do not contract with insurance companies, and thus are considered out-of-network, generally receive higher reimbursement than in-network providers would for the same services—putting aside any additional sums collected through surprise balance bills to the patient. ¶ 39.

## III.   **LEGAL STANDARD**

A motion for judgment on the pleadings provides a means of disposing of a case where "all material allegations of fact are admitted in the pleadings and only questions of law remain." *Tseng v. Nordstrom, Inc.*, 2016 WL 7403288, at *2 (C.D. Cal. Dec. 19, 2016) (citing *McGann v. Ernst & Young*, 102 F.3d 390, 392 (9th Cir. 1996)).  The district court must accept as true all nonconclusory allegations in the nonmoving party's pleadings, and view the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).  Judgment on the pleadings is proper only when the moving party "clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that [the moving party] is entitled to judgment as a matter of law."  *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989).

## IV.   **ARGUMENT**

### A.   **ERISA Does Not Preempt Plaintiff's Claims.**

Defendants seem to think that if a claim has *any* connection whatsoever, no matter how remote, to an ERISA plan, preemption applies.   While ERISA's preemption clause broadly states that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," ERISA § 514(a), as amended, 29 U.S.C. § 1144(a), the Supreme Court has long recognized that courts "must go beyond the unhelpful text" and avoid an "uncritical literalism" that would make preemption turn on "infinite connections." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655–56 (1995); *accord Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 983–84 (9th Cir. 2001) (emphatically rejecting the defendant's argument that the state claim must "relate to" an ERISA plan because the challenged conduct would not have occurred

"but for" the ERISA plan, explaining that it "smacks of the 'uncritical literalism' the Supreme Court has admonished us to eschew").

The Supreme Court similarly criticized its earlier guidance that a state law relates to an ERISA plan "if it has a connection with or reference to such a plan," noting that "connection with" is "scarcely more restrictive than 'relate to.'" *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (examining *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983), in light of *Travelers*, 514 U.S. at 656). To clarify the proper scope of the two-part inquiry, "connection with" and "reference to" have been treated as terms of art with their own definitions.

The term "reference to" has a "fairly precise and narrow definition." *Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson*, 201 F.3d 1212, 1216 (9th Cir. 2000). A state law has a "reference to" an ERISA plan when (1) the law "acts immediately and exclusively upon ERISA plans," or (2) "the existence of ERISA plans is essential to the law's operation." *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1082 (9th Cir. 2009) (quoting *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 546 F.3d 639, 657 (9th Cir. 2008) (quoting *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997))). Plaintiff's claims are based on the UCL, CLRA, and common law contract principles; these laws do not act "immediately and exclusively" on ERISA plans, nor does the operation of these laws rely on the existence of ERISA plans. *See, e.g.*, *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 121 F. Supp. 3d 950, 965 (C.D. Cal. 2015) ("It is plain that California fraud law does not make reference to ERISA plans, as it is a law of general applicability that neither 'acts immediately and exclusively upon ERISA plans,' nor relies upon the existence of ERISA plans to operate." (citing *Paulsen*, 559 F.3d at 1082 (finding state law negligence claims based on the common law and California statutes were not preempted under "reference to" analysis for the same reasons))).

As to the "connection with" part of the inquiry, the Supreme Court has advised courts to "look both to 'the objectives of the ERISA statute' … as well as to the nature of the effect of the state law on ERISA plans." *Dillingham*, 519 U.S. at 325 (quoting *Travelers*, 514 U.S. at 656). Courts in this Circuit use a relationship test in assessing whether a claim has a "connection with" an ERISA plan; more specifically, courts ask if the action will have a genuine impact on an ERISA-regulated relationship. *Paulsen*, 559 F.3d at 1082 (citing *Providence Health Plan v. McDowell*, 385 F.3d 1168, 1172 (9th Cir. (2004)). While ERISA regulates relationships between plan and plan member, plan and employer, and employer and employee, *id.*, Plaintiff's claims concern the duties owed to a patient by an out-of-network health care service provider–a provider that is not a party to the plan or a beneficiary covered by the plan–in short, a relationship that is *not* regulated by ERISA.

Defendants' argument that Plaintiff's suit impacts an ERISA-regulated relationship fails for a simple reason: there is no dispute over plan terms or whether the plan correctly distributed benefits. *Cf. Botsford v. Blue Cross & Blue Shield of Montana, Inc.*, 314 F.3d 390, 395–96 (9th Cir. 2002) (explaining that the case at hand involves a dispute over what benefits are due under the plan, and distinguishing cases where the claims did not revolve around a breach of the plan and thus preemption did not apply). The outcome of this case has no bearing on the duties owed by the plan to beneficiaries under the plan; the plan fiduciary will not have to do anything differently should Plaintiff prevail, and the terms of the plan will not be altered or otherwise impacted.

Defendants inappropriately point to plan language, found nowhere in the pleadings, warning enrollees that they *may* be billed for services provided by out-of-

network providers at in-network facilities.[5]  However, even if the plan language was properly before the Court, it would be beside the point.  Defendants should know when their physicians are not in-network to the same insurance plans as the hospital, yet until they bill the patient, they do not identify the name of the physician group actually providing services, which information is necessary to allow consumers to call their insurance companies to determine whether the emergency department physicians are in-network to their plans. Nor do Defendants post notice in the emergency department stating the emergency department is run by a separate company from the hospital and listing exactly which insurance plans are accepted by the emergency department doctors.  A boilerplate warning by another, not Defendants, that consumers may be charged for out-of-network services rendered at in-network facilities—a common feature of health benefit plans, regardless of ERISA status—is not a meaningful disclosure as it does not provide consumers with the information they need to make an informed decision and does nothing to mitigate the harm caused by Defendants' failures to disclose. A vague, generic warning of a possible charge is of no help to consumers when Defendants know that the charge is certain and definite yet make it impossible to avoid the warned-of scenario.

Whether an insured patient has an ERISA plan or non-ERISA plan is completely irrelevant to Plaintiff's case, as Plaintiff's theory operates without regard to whether an insured patient's plan is governed by ERISA or not.  Furthermore, success on Plaintiff's claims against Defendants would not work a change in the benefits that an ERISA plan must provide to its beneficiaries.   Under the "relationship test," therefore, preemption is not warranted.

Moreover, Plaintiff's claims are harmonious with the central objectives of ERISA.  Allowing state claims for unfair and unlawful business practices by out-of-

---

[5] Plaintiff's opposition to Defendants' Request for Judicial Notice of the plan is being filed simultaneously herewith.

network health care providers does not impede the uniform national administration of employee benefit plans or contribute to regulatory uncertainty or inconsistency, and the important policy of protecting employee interests weighs strongly against preemption. *See Burdick v. Union Sec. Ins. Co.*, 2009 WL 4798873, at *11, 13 (C.D. Cal. Dec. 9, 2009) (citations omitted).

The bottom line is that a claim need not be entirely unrelated to an ERISA-covered plan to escape preemption. *See, e.g.*, *Almont Ambulatory Surgery*, 121 F. Supp. 3d at 969 ("[T]he bare fact that the Plan may be consulted in the course of litigating a state-law claim does not require that the claim be extinguished by ERISA[] …." (quoting *Blue Cross of California v. Anesthesia Care Associates Med. Grp., Inc.*, 187 F.3d 1045, 1051 (9th Cir. 1999)). Courts have long rejected an unreasonably expansive interpretation in which ERISA would preempt nearly everything, favoring a pragmatic approach where Congress' intent in passing ERISA serves as a central touchstone. The Ninth Circuit's "relationship test" reflects that the purpose of ERISA was to govern relationships between plan fiduciaries and beneficiaries. Consistent with this understanding, cases that have found ERISA preemption typically did so because the claims, although brought under state law, involved disputes over ERISA benefits. Here, there is no controversy as to the interpretation of plan language or the benefits due under the terms of the plan, and Plaintiff's claims do not directly affect any relationship between traditional ERISA entities. Consequently, ERISA preemption does not apply.

**B.    Plaintiff Has Stated Claims Under the CLRA and UCL.**

The CLRA bans certain "unfair or deceptive acts or practices" in transactions for the sale of services to consumers. Cal. Civ. Code § 1770(a). Unlawful practices under the CLRA include those that lead a consumer to believe "a person has a sponsorship, approval, status, affiliation, or connection that he or she does not," § 1770(a)(5), or that "a transaction confers or involves rights, remedies, or obligations

that it does not have or involve." § 1770(a)(14).  Defendants violate the CLRA by failing to disclose that their emergency department physicians are not in-network to the same insurance plans as the hospital itself and omitting information that would allow consumers to ascertain coverage, ¶¶ 4, 24, abuses that are compounded when Defendants charge rates in excess of the fair market value that they are entitled to, and demand patients pay the full billed amount (or face collection and other legal actions), again in violation of the CLRA.  ¶¶ 38, 40-43.

The CLRA reaches both affirmative misrepresentations and "the concealment or suppression of material facts."  *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (2011).  Failure to disclose is actionable under the CLRA when the nondisclosed information is material and there was a duty to disclose.  *See Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1094-95 (N.D. Cal. 2007).

In the CLRA context, information is "material" if a "reasonable consumer" would have considered it important in determining how to act in a transaction.  *eMachines*, 202 Cal. App. 4th at 256 (citations omitted).  A reasonable consumer, having obtained insurance coverage and elected to seek treatment at an in-network hospital, would certainly attach importance to whether the doctors in the hospital's emergency department are out-of-network and their services not fully covered, especially when those services are billed at rates in excess of fair market value.  *See, e.g.*, ¶¶ 2, 78, 86.  Importantly, materiality is generally a question of fact unless the nondisclosed information is "so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it."  *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 977 (1997).  The Complaint's allegations about the extreme disparity between Defendants' charges and average charges for the same services in the same zip code amply support a finding of materiality, ¶ 38, and Defendants' failures to disclose cannot reasonably be deemed immaterial as a matter of law.

A duty to disclose arises when a defendant is "in a superior position to know" material facts not known to the plaintiff.  *Falk*, 496 F. Supp. 2d at 1096-97.  The crucially important information to consumers—e.g., what insurance plans the emergency department physicians participate in, and what rates out-of-network emergency physician services were billed at—was controlled by the Defendants and not reasonably available to consumers.  *See, e.g.*, ¶¶ 4, 22, 24, 77-78.  Defendants thus had a duty to disclose, and consumers were likely to be misled by the omission of, this critical information.  ¶¶ 84-87.

Defendants contend that even if their conduct was deceptive or misleading, Plaintiff has not shown reliance.  However, reliance may be inferred on a classwide basis where *materiality* of the nondisclosures is shown.  *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292, 1294-95 (2002) (permitting an inference of common reliance where the record revealed no evidence that any significant part of the class had access to all the information important to their decision to enter the transaction), *superseded by statute on another point as recognized in Steroid Hormone Product Cases*, 181 Cal. App. 4th 145, 154 (2010).  The Complaint alleges Defendants systematically failed to make disclosures, *see, e.g.*, ¶¶ 4, 55-57, 62, 75, disclosures that, as previously discussed, a trier of fact could find would be important to reasonable consumers.

Moreover, whether reliance was reasonable—or, put another way, whether a consumer was likely to be misled or deceived by a failure to disclose material information—is a question of fact for the jury under California law, and may be decided as a matter of law only if the undisputed material facts support a single conclusion.  *Almont Ambulatory Surgery*, 121 F. Supp. 3d at 974 (citations omitted).  At this stage in the litigation, where Plaintiff's material allegations must be accepted as true for the purposes of this motion, Plaintiff is entitled to a presumption of classwide reliance.  The allegations support that Defendants consistently failed to

disclose material information that was known to Defendants but not otherwise reasonably available to consumers, omissions that misled consumers and caused them harm.  ¶ 87.  Plaintiff has, therefore, adequately pleaded a claim for violation of the CLRA.

The UCL broadly prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code, § 17200.  Because the statutory language is disjunctive, courts often refer to the "three prongs" or theories that support a UCL claim.  *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999) (citations omitted).  Under the "unlawful" prong, an act or practice is deemed "unfair competition" if it is prohibited by another law.  *Id.* Violations of federal, state, or local law, whether statutory or judicially made, all may serve as a predicate for a UCL claim under the "unlawful" prong.  *Munson v. Del Taco, Inc.,* 46 Cal. 4th 661 (2009).  Consequently, by stating a claim under the CLRA, the Complaint states a UCL violation as well.

Defendants repeatedly point out that the practice of balance billing is lawful, and it is true that under the UCL, courts may not declare a practice "unlawful" or "unfair" where another statute on the subject clearly permits the conduct.  *See Cel–Tech*, 20 Cal. 4th at 182 (noting, however, that a court is not precluded from deeming conduct unfair under the UCL if some other statute on the subject merely fails to prohibit the challenged conduct).  However, Plaintiff's claims do not concern the mere practice of balance billing but instead center on Defendants' practices in failing to disclose material information that would allow a patient to avoid being balance billed and charging rates far above fair market value.

This conduct also violates the UCL under the "unfair prong."  Even if an act or practice is not specifically prohibited by law, it may still fall under the "unfair" prong, which sweeps broadly to enable courts to deal with wrongful business conduct that violates the fundamental rules of honesty and fair dealing.  *Id.* at 180-

181 (citations omitted).  Multiple criterion have been used to determine whether a business practice is "unfair" under the UCL.  *See Moran v. Prime Healthcare Mgmt., Inc.*, 3 Cal. App. 5th 1131, 1150 (2016)

> One states [a]n 'unfair' business practice occurs when that practice 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. A second rule provides the public policy which is a predicate to the action must be tethered to specific constitutional, statutory or regulatory provisions. A third holds [a]n act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided. (internal quotations and citations omitted).

While courts diverge in defining an "unfair" business practice, "the determination is generally factual."  *Beltran v. Avon Prod., Inc.*, 2012 WL 12303423, at *6 (C.D. Cal. Sept. 20, 2012).  Thus, this Court would have to conclude, as a matter of law, that Defendants' practices were not "unfair" before granting Defendants' motion for judgment on the pleadings as to this claim.  That conclusion is not warranted under any of the competing standards.

The California Supreme Court examined various characterizations of the requirements under the "unfair" prong in *Cel–Tech*, endorsing a test drawn from section 5 of the Federal Trade Commission Act: a business practice is "unfair" if it is (1) substantially injurious to the consumer, (2) the injury is not outweighed by countervailing benefits to consumers or competition, and (3) the injury is not one that consumers themselves could have reasonably avoided.  20 Cal. 4th 163 at 185-186.

1   The Ninth Circuit has endorsed a balancing test in the consumer fraud context,

2   reasoning that the "unfairness" test from *Cel–Tech* may be limited to the antitrust

3   context.  *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007).

4   The balancing test asks whether the utility of the challenged practice is outweighed

5   by the gravity of the harm to the victim.  *South Bay Chevrolet v. Gen. Motors*

6   *Acceptance Corp.*, 72 Cal. App. 4th 861, 886–87 (1999).  When utilizing this

7   approach, a court examines the impact on the victim, balancing it against the reasons,

8   justifications, and motives of the alleged wrongdoer.  *Id.*

9   Under either of these tests, Defendants' conduct is "unfair."  Plaintiff's

10  Complaint alleges that Defendants' practices cause harm to consumers, and that the

11  injury is not one that consumers themselves could have reasonably avoided.  *See,*

12  *e.g.*, ¶¶ 24, 28, 77-79.  Defendants do not offer any meaningful "reasons,

13  justification, or motives" or a satisfactory explanation of the utility of their conduct.

14  *See Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 921–22 (N.D. Cal. 2013).

15  Perhaps the closest Defendants come is when they raise concerns about a

16  possible delay in the examination and treatment of patients.  But Defendants create

17  a straw man by misrepresenting Plaintiff's position and what is required of

18  Defendants.  In actuality, there are simple measures Defendants could take to avoid

19  misleading consumers.  For example, Defendants could post a sign in the emergency

20  department stating that the emergency department is a separate company from the

21  hospital, or that the emergency department physicians are not hospital employees

22  and are not in-network to all the same plans as the hospital itself, and disclose the

23  name of the physician group providing emergency department services, without

24  which information, a consumer cannot determine whether the physicians are in-

25  network under her plan.  Or, Defendants could post a sign in the emergency

26  department stating it is a different company than the hospital and listing exactly

27  which insurance plans are accepted by emergency department physicians.  Instead,

28

Defendants' practices make it impossible for consumers to avoid, or even know about, out-of-network charges.

Defendants contend that Plaintiff seeks to impose a novel duty on out-of-network emergency department heath care providers, conveniently ignoring that Defendants' services go beyond physician staffing. ¶¶ 14, 22, 77. Plaintiff's position has always been that the entities that operate the emergency department—here, the Defendants—should make appropriate disclosures so that consumers are not misled and have access to the information they need to make an informed decision. Plaintiff's position has *never* been that individual treating physicians are obligated to make disclosures regarding insurance coverage.[6] Defendants' invocation of EMTALA simply has no relevance here.

Finally, a third possible approach holds that a business practice is "unfair" within the meaning of the UCL "if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *McKell v. Wash. Mut. Inc.*, 142 Cal. App. 4th 1457, 1473 (2006) (citations omitted). A reasonable trier of fact could certainly find that Defendants' conduct—which takes advantage of consumers at a time of unique vulnerability (e.g., a medical emergency)—is immoral, unethical, oppressive or unscrupulous. The challenged practices have not been shown to provide any benefits to consumers, let alone benefits that outweigh their harm.

Although this third standard is in the disjunctive ("if it violates established public policy **or** if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefit" (emphasis added)), Defendants' conduct also offends public policy. The common law has long recognized that a fair

---

[6] Practically speaking, emergency department physicians may not know this information and are simply not in a position to personally make such disclosures. Defendants control contracting with insurers and have knowledge of what plans the emergency department physicians are in-network to.

contract is implied by law for the reasonable value of professional medical services in circumstances where no express contract governs.  ¶ 78; *see, e.g.*, *Robbins v. Town of Homer*, 103 N.W. 1023 (Minn. 1905).  Statutory provisions on the state and federal level reflect this principle, entitling the provider of emergency care to the reasonable and fair value of the services rendered.  ¶¶ 40-41, 78; *see Children's Hosp. Cent. California v. Blue Cross of California*, 226 Cal. App. 4th 1260, 1272-74 (2014) (examining Cal. Code Regs. Tit. 28, § 1300.71(a)(3)(B)) and explaining that its "directive to pay noncontracted providers the reasonable and customary value of their services embodies the concept of quantum meruit," as well as noting the promulgating agency's position that it did not alter or change existing California law).  By billing and collecting or attempting to collect fees in excess of what is reasonable, Defendants undermine the public policy goal of appropriately balancing the interests of both consumers and providers of emergency medical care.

Considering the Complaint as a whole, and taking Plaintiff's material allegations as true, Plaintiff has stated claims for violation of the CLRA and the UCL under both the "unlawful" and "unfair" prongs.

## C.   Plaintiff Adequately Alleges Defendants' Breach of Implied Contract.

When an insured patient receives emergency care from an out-of-network physician, there is no express contractual relationship between them that governs the transaction.  It is well established that in these circumstances a contract is implied between the provider of the emergency medical services and the recipient of those services.  *See Children's Hosp. Cent. California*, 226 Cal. App. 4th at 1274.  *See generally* Richard A. Posner, *Economic Analysis of Law* (6th ed. 2003).  The provider is entitled to the reasonable value of the services rendered, *see Palmer v. Gregg*, 65 Cal. 2d 657, 660 (1967), not whatever rate the provider feels like charging. *See, e.g.*, *Howell v. Hamilton Meats & Provisions, Inc.*, 52 Cal. 4th 541, 564 (2011)

("[A] medical care provider's billed price for particular services is not necessarily representative of … their market value.").

Here, Defendants' rates were *more than 4.5 times greater* than average negotiated third-party rates for the same services. ¶ 38. The Complaint's allegations support that Defendants charged rates in excess of the reasonable fair market value of the services, breaching the implied contract. ¶¶ 38, 40-42.

Defendants acknowledge the allegations that they billed at excessive rates much higher than the reasonable value price term imposed by law, yet apparently believe that Plaintiff has not identified any unlawful or inequitable act. Specifically, Defendants object that Plaintiff did not allege that she had *paid* more than the reasonable value of the services, just that she had been *billed* for an amount in excess of the reasonable value of the services.[7] The implication is that it is not unlawful or inequitable to bill for an amount beyond what one is entitled to—until the ruse pays off, that is. This cute distinction is not supported by law.[8] If the Defendants were right, the result would be absurd: consumers would be required to pay amounts they did not lawfully owe and only then would they have recourse in court, at which point the payments would be returned to them. This Kafkaesque scenario is thankfully not required by the law.

_____

[7] Defendants also sent her account to collections. ¶¶ 34-35.

[8] Defendants cite to *Durrell v. Sharp Healthcare*, 183 Cal. App. 4th 1350 (2010), and *Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373 (2010), to support their position that Plaintiff's cause of action for breach of implied contract must be dismissed. Those cases are distinguishable because the parties had ***express contracts*** that legally precluded them from bringing claims seeking restitution for breach of implied contracts. *See Durrell*, 183 Cal. App. 4th at 1370 ("As a matter of law, an unjust enrichment claim does not lie where the parties have an enforceable express contract. An unjust enrichment theory is inapplicable because Durrell alleges the parties entered into express contracts."); *see also In re Palmdale Hills Prop., LLC v. Argent Mgmt., LLC*, 2017 Bankr. LEXIS 2162 *48 (Bankr. C.D. Cal. Aug. 2, 2017) (finding that *Durrell's* statement (in *dicta*) that restitution is improper where the plaintiff received the exchange that it expected does not apply "beyond cases where the parties have a[n express] contract governing the issue").

Receipt of a bill demanding payment of an unlawful amount is injurious to a consumer, representing "at least an imminent invasion of a legally protected interest." *See, e.g.*, *Sarun v. Dignity Health*, 232 Cal. App. 4th 1159, 1169 (2014), as modified (Jan. 13, 2015).  Plaintiff is entitled to relief.

**D.    The Factual Allegations Sufficiently Support the Claims Against Defendants EmCare and Envision.**

Defendants, working in concert, control Corona emergency department operations, providing medical and support staff, contracting with insurance carriers on behalf of providers, and performing administrative and billing functions.  *See, e.g.*, ¶¶ 14, 18, 20, 22, 24, 77, 86.  Although Defendants ask that Defendants EmCare and Envision be dismissed from the lawsuit, they do not deny the allegations that Defendants EmCare and Envision, the larger entities, controlled the policies and practices at issue in the lawsuit, which were similarly implemented in other California EDs they operate.  ¶¶ 4, 28, 56-57, 62, 75.  Instead, Defendants attack the allegations in the Complaint as too vague to be sufficient.

Defendants misunderstand what is required at this stage of the proceedings.  A complaint "does not need detailed factual allegations." *Bell Atlantic v. Twombly*, 550 U.S. at 555 (2007).  Instead, the factual allegations should provide fair notice and enable the opposing parties to defend themselves effectively.  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2015).

The factual allegations in the Complaint support that Defendants Envision and EmCare played a significant role in operating the Corona ED, the exact contours of which will be clarified as discovery progresses.  A defendant is not entitled to judgment on the pleadings if the Complaint raises issues of fact that, if proven, would support recovery. *See Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989) (explaining that judgment on the pleadings is only proper if there are "no issues of

material fact" and the moving party is entitled to "judgment as a matter of law"); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988) (noting that the moving party must clearly establish no material issue of fact remains to be resolved).[9]

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion.

Respectfully submitted this 25th day of January, 2018.

---

[9]Plaintiff believes judgment on the pleadings is not appropriate, but should this Court disagree, Plaintiff respectfully requests leave to amend.  *See Tseng*, 2016 WL 7403288, at *3 ("Although Rule 12(c) contains no mention of leave to amend, 'courts generally have discretion in granting 12(c) motions with leave to amend, particularly in cases where the motion is based on a pleading technicality.'" (quoting *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1084 (N.D. Cal. 2007)).  Generally, a court should freely give leave to amend, as there is a strong policy in favor of allowing amendment unless amendment would be futile, results from bad faith or undue delay, or will unfairly prejudice the opposing party.  *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994).  Amendment would not be futile as additional facts can be alleged to cure any deficiencies.



By: /s/ *Jonathan M. Rotter*
Jonathan M. Rotter (SBN 234137)
**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (SBN 134180)
Robert V. Prongay (SBN 270796)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  info@glancylaw.com

By: /s/ *Chet B. Waldman*
Chet B. Waldman (admitted *Pro Hac Vice*)
**WOLF POPPER LLP**
845 Third Avenue 12th Floor
New York, NY 10022
Telephone: (212) 759-4600
Fax: (212) 486-2093
Email: cwaldman@wolfpopper.com

*Attorneys for Plaintiff*

**<u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On January 25, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 25, 2018, at Los Angeles, California.

<u>*s/ Jonathan M. Rotter*</u>
Jonathan M. Rotter

## Mailing Information for a Case 5:17-cv-01935-FMO-SHK Renee MacLaughlan Bozarth v. Envision Healthcare Corporation et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John Joseph Atallah**
  jatallah@foley.com,dgalvez@foley.com

- **Patricia I Avery**
  pavery@wolfpopper.com

- **Jonathan M Brenner**
  jbrenner@ebglaw.com,jonathan-brenner-8688@ecf.pacerpro.com,cemail@ebglaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **J Susan Graham**
  cemail@ebglaw.com,sgraham@ebglaw.com

- **R David Jacobs**
  cemail@ebglaw.com,djacobs@ebglaw.com

- **Kimberly Ann Klinsport**
  kklinsport@foley.com,LACA-litigationdocket@foley.com,dkmiller@foley.com

- **Alan R Ouellette**
  aouellette@foley.com,llanglois@foley.com

- **Robert S Plosky**
  rplosky@wolfpopper.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Eileen R Ridley**
  eridley@foley.com,wdelvalle@foley.com,tschuman@foley.com

- **Jonathan M Rotter**
  jrotter@glancylaw.com

- **Chet B Waldman**
  cwaldman@wolfpopper.com,rplosky@wolfpopper.com,cdunleavy@wolfpopper.com,ehachmeister@wolfpopper.com,pavery@wolfpopper.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`